ARCTIC ICE CREAM COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JULIUS LENCIONE, SR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 94984, 94985.   Filed October 21, 1964.

*Edward W. Rothe*, for the petitioners.

*George G. Young*, for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in income tax, declared value excess profits tax, excess profits tax, and additions to tax under section 293(b) of the Internal Revenue Code of 1939:

*Arctic Ice Cream Co. docket No. 94984*

| Year | Income tax | Declared value excess profits tax | Excess profits tax | Addition to tax, sec. 293(b), I.R.C. 1939 |
|---|---|---|---|---|
| 1944 | $4,717.55 | | | $2,358.78 |
| | | $9,376.81 | | 4,688.41 |
| 1945 | | | $58,149.16 | 29,074.58 |
| | None | | | 689.54 |
| | | 4,001.42 | | 3,583.57 |
| | | | 27,095.98 | 29,296.54 |
| 1946 | 14,229.22 | | | 33,114.61 |

*Julius Lencione, Sr., docket No. 94985*

| Year | Income tax | Addition to tax, sec. 293(b), I.R.C. 1939 |
|---|---|---|
| 1944 | $21,489.20 | $10,744.60 |
| 1945 | 5,926.50 | 2,963.25 |
| 1946 | 87,209.47 | 43,604.74 |

The issues for decision are as follows:

(1) Whether Arctic Ice Cream Co. failed to report income for the years 1944, 1945, and 1946 in the amounts determined by respondent or in any other amounts.

(2) Whether Arctic Ice Cream Co. is entitled to additional deductions for the years 1944, 1945, and 1946 for alleged unrecorded purchases of raw material.

(3) Whether any part of the deficiencies asserted against Arctic Ice Cream Co. for the years 1944 and 1945 is due to fraud with intent to evade tax.

(4) Whether Arctic Ice Cream Co. is estopped, by reason of a prior conviction for willful attempted income tax evasion for the year 1946, from denying that a part of the deficiency asserted against it for that year was due to fraud with intent to evade tax.

(5) Whether the statute of limitations bars assessment and collection of the deficiencies in tax asserted against Julius Lencione, Sr., for the years 1944, 1945, and 1946.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. Their stipulations, together with attached exhibits, are incorporated herein by this reference.

Arctic Ice Cream Co. (sometimes hereinafter referred to as Arctic) is an Illinois corporation having its principal place of business in Chicago, Ill. Its Federal corporation income, declared value excess profits, and excess profits tax returns for the calendar years 1944 and 1945 and its income tax return for the calendar year 1946, made on the accrual basis, were timely filed with the then collector of internal revenue for the first district of Illinois. Julius Lencione, Sr. (sometimes hereinafter referred to as Lencione), is an individual residing in Chicago, Ill. His Federal income tax returns for the taxable years 1944, 1945, and 1946 were timely filed with the then collector of internal revenue for the first district of Illinois.

Arctic Ice Cream Co. was organized on November 3, 1933. During the period material to this proceeding and for some time prior thereto its business consisted of the manufacture and sale of bulk and package ice cream and related frozen dairy products to ice cream parlors, grocery and delicatessen stores, and restaurants. Julius Lencione, Sr., was the founder and has at all times pertinent hereto been president and principal stockholder of Arctic. Edwin T. Riordan (sometimes hereinafter referred to as Riordan) was, during the period here material, Arctic's secretary and treasurer and second to Lencione in command of the business.

The commercial manufacture of ice cream is accomplished by whipping and freezing a mixture of butterfat, milk-solids-not-fat, sugar

stabilizer, and flavoring. With the onset of World War II, ice cream manufacturers, such as Arctic, were subjected to U.S. Department of Agriculture regulation as to the amounts of butterfat, milk-solids-not-fat, and sugar which they could use in their businesses. Sugar rationing began in April 1942 and lasted until July 1947. During the period 1944–46 ice cream manufacturers were allotted a quota of 70–80 percent of their 1941 base period usage of sugar. Rationing of butterfat and milk-solids-not-fat began in February 1943 under War Food Order No. 8 and except for May, June, and July of 1944, when higher quotas were authorized, ice cream manufacturers were prohibited pursuant thereto from using more than 65 percent of the butterfat and milk-solids-not-fat used during the corresponding month in the December 1, 1941–November 30, 1942, base period. On March 1, 1945, milk-solids-not-fat were removed from the effect of rationing and on August 31, 1945, butterfat was likewise removed.

The technique of milk-solids-not-fat and butterfat rationing was such that the quota restrictions and sanctions (which were of both a criminal and civil nature) applied not to a seller of rationed merchandise, but to a user. For the first few months subsequent to the promulgation of War Food Order No. 8 Arctic attempted to comply with the quota restrictions prescribed, but Lencione and Riordan soon determined that the cutback in ice cream production attendant upon continued compliance with War Food Order No. 8 would make it exceedingly difficult, if not impossible, for Arctic to stay in business. They therefore decided that Arctic should obtain the necessary ingredients to maintain its production from the so-called black market.

During the years 1944, 1945, and 1946 Arctic made substantial purchases on the black market of butterfat, milk-solids-not-fat, and sugar. None of these black-market purchases were reflected upon the books and records of Arctic, except to the extent that they were indirectly reflected in a gallonage record maintained by Arctic which purported to show the total amount of all products sold.

During the first few months of Arctic's black-market purchasing, the cash with which to make such purchases was supplied directly by Lencione from his own personal funds. However, when it became apparent that he could not continue to supply money in this manner, he discussed the situation with Riordan and they determined to withhold from recordation a part of Arctic's receipts for use in making black-market purchases. Although a purpose of withholding such receipts was to evade the Department of Agriculture regulations by avoiding entries on the books reflecting black-market purchases, the necessary effect of such conduct was the understatement of Arctic's taxable income for Federal tax purposes.

The following schedule shows for each of the years 1944, 1945, and 1946 the amounts by which Arctic understated its sales, its black-market purchases, and its taxable income:

|  | 1944 | 1945 | 1946 |
|---|---|---|---|
| Total sales | $428, 231. 36 | $530. 137. 79 | $687, 268. 09 |
| Total sales per tax returns | 337. 883. 35 | 526, 402. 81 | 537, 116. 32 |
| Understated sales | 90, 348. 01 | 3, 734. 98 | 150, 151. 77 |
| Black-market purchases not deducted | 51. 779. 54 | 18, 566. 64 | 75, 099. 04 |
| Unreported taxable income | 38, 568. 47 | (14, 831. 66) | 75, 052. 73 |

While Arctic occasionally made sales directly from its plant, most of its sales were made by its truckdrivers, each of whom had a route with designated customers to be called on and serviced. Each Arctic driver was given a ring of tickets showing the names of the customers on his route, the prices each was to pay for Arctic's products, and an indication whether the customer was allowed to charge his purchases or was required to pay cash. When a driver made a sale, he filled out, in duplicate, a sales invoice showing the quantity of each kind of merchandise sold (e.g., 5 gallons of bulk ice cream, 8 gallons of pint brick ice cream, etc.), the total price applicable to each kind of merchandise sold, and the total price of all merchandise sold to the customer. If the customer was one who was authorized to charge his purchases, the driver so indicated on his sales invoice; otherwise he collected the amount due—usually in cash, but sometimes in the form of checks. The original of each sales invoice was given by the driver to the customer and the copy was retained by him. Each night when they returned to the Arctic plant, the drivers "checked in." "Checking in" consisted of separating the sales invoices turned in by the drivers into two stacks (cash and charge sales), totaling the cash invoices on an adding machine, and making sure the cash and checks turned in by the drivers equaled the total of the cash invoices. The primary responsibility for checking in the drivers lay with Riordan.

The method by which Arctic obtained money for its black-market purchases was as follows: Each night, when the drivers checked in, Riordan, with Lencione's consent, would set aside a part of their cash receipts to be used for black-market purchases. Riordan also suppressed a part of the cash receipts from plant sales. If the money which was suppressed was more than what was needed for immediate black-market purchases, it was commingled with Lencione's personal funds (returns from investments and real estate rentals) contained in a pouch in the office safe. The contents of this pouch were usually on the following day placed in Lencione's personal safe-deposit box at his bank. Lencione then advanced whatever was needed to make black-market purchases from this safe-deposit box. On the books and

records of Arctic such "advances," of what were by and large suppressed corporate receipts, were treated as loans to the corporation from Lencione.

Not all of the cash receipts which were suppressed and not immediately disbursed for black-market purchases and which were therefore turned over to Lencione were later "advanced" back to the corporation for subsequent purchases. These funds, which were retained by Lencione, were handled on the books and records of Arctic as repayments of certain bona fide loans which Lencione had made to the corporation since its inception in 1933. The following is a summary of various accounts (which have been stipulated by the parties) which we find reflects both Arctic's bona fide indebtedness to Lencione and Arctic's repayment of that indebtedness during the years in issue:

| | 1944 | 1945 | 1946 |
|---|---|---|---|
| Opening balance due Lencione | $100,830.25 | $90,893.79 | $6,009.56 |
| Advance to Arctic | | 39,769.08 | 176,289.70 |
| Bonus to Lencione | | 20,000.00 | |
| Total investment | 100,830.25 | 150,662.87 | 182,299.26 |
| Cash receipts shortage | | (144,520.81) | |
| Increase in Lencione's capital | | | (135,617.20) |
| Withdrawals by Lencione | 4,855.45 | (132.50) | (23,216.28) |
| Miscellaneous charges to Lencione | 5,081.01 | | (9,848.63) |
| Closing balance due Lencione | 90,893.79 | 6,009.56 | 13,617.15 |

Petitioner Arctic Ice Cream Co. is the same person [1] who was the defendant in the criminal case of *United States of America* v. *Arctic Ice Cream Co.*, No. 53CR175, in the U.S. District Court for the Northern District of Illinois, Eastern Division. The Commissioner of Internal Revenue, respondent herein, is a party in privity with the United States of America which was party plaintiff in the aforesaid criminal case No. 53CR175.

On March 12, 1953, the grand jury returned an indictment in the U.S. District Court for the Northern District of Illinois, Eastern Division, charging, *inter alia*, that Arctic Ice Cream Co. did willfully and knowingly attempt to defeat and evade a large part of its tax due and owing for the calendar year 1946 by filing a false and fraudulent income tax return wherein it was alleged that the corporation had sustained a loss for the year 1946 whereas it was well known that the corporation had substantial income upon which a tax was due and owing to the United States of America.[2] On December 3, 1954, Arctic entered a plea of guilty to this indictment and on February 21, 1955, the U.S. District Court rendered its judgment of conviction against Arctic.[3] Such judgment of conviction has never been modified or appealed and has now become final.

---

[1] See sec. 7701(a)(1), I.R.C. 1954.

[2] A true and correct copy of this indictment is a part of the record in the instant proceeding.

[3] A true and correct copy of the judgment of conviction is a part of the record herein.

ULTIMATE FINDINGS

A part of the deficiencies in income, declared value excess profits, and excess profits taxes of Arctic Ice Cream Co. for the year 1944 is due to fraud with intent to evade tax.

No part of the deficiencies asserted against Julius Lencione, Sr., for the years 1944, 1945, and 1946 is due to fraud with intent to evade tax.

OPINION

1. *Arctic's Unreported Income.*—Respondent has determined that Arctic had unreported sales for the years 1944, 1945, and 1946 in the respective amounts of $111,112.12, $28,792.62, and $206,629.95. Petitioner, on the other hand, contends that unreported sales for these years amount to $90,348.01, $3,734.98, and $150,151.77, respectively. Both parties have reconstructed Arctic's unreported income by deducting the sales reported on Arctic's tax returns from Arctic's total sales, determined by multiplying the gallons and dozens of products sold, according to the gallonage record, by the average unit sales prices for those products. Since the average unit sales prices for novelty items (dozens) were stipulated, the different results arrived at by the parties are attributable solely to the different average unit prices used for bulk and brick products (gallons).

The average unit prices for bulk and brick products used by respondent were determined from a customer card file supplied to respondent's agent by Arctic. This card file contained a card for each of Arctic's customers showing the price that customer paid for the various products offered. The card file was not kept up to date and frequently did not reflect reductions in price to particular customers who had achieved a volume sufficient to warrant such reductions. By taking the highest and lowest prices from the customer card file respondent's agent determined the *median* prices charged for bulk and brick products, and it is these *median* prices which respondent contends are here controlling.

Petitioners, on the other hand, calculated the unit sales price for bulk and brick products by computer tabulation and mathematical computation of some 100,000 individual sales invoices of Arctic for the years involved (which indicated the *exact* price paid by each customer for each gallon of bulk and brick product sold) to arrive at an *arithmetical mean* or *average* price charged for bulk and brick products.

In our view, petitioners' computations of average unit sales prices more accurately approach the prices which were actually charged during the years at issue and our acceptance of such computations is reflected in our findings.

2. *Arctic's Unreported Black-Market Purchases.*—In his notice of deficiency respondent allowed Arctic the sum of $40,000 as the additional cost of purchases for 1944. He determined, however, that

Arctic was entitled to no additional costs for purchases in 1945 and 1946. While respondent's determination is, of course, entitled to a presumption of correctness, such presumption is by no means conclusive and petitioners are at liberty to show, by a preponderance of the evidence, its incorrectness. This we believe petitioners have done. Without becoming embroiled in the mass of evidence produced by petitioners, we feel it sufficient to observe that they have reconstructed an unimpeached set of records, based in the main upon Arctic's cost of goods sold as reported on its tax returns for the years 1944, 1945, and 1946 and on the gallonage record, which in the absence of countervailing evidence convinces us that Arctic is entitled to the additional deductions which are reflected in our findings.

3. *Fraud Issue With Respect to Arctic for 1944 and 1945.*—The burden of proof on this issue was upon respondent and we think that as to the year 1944, in which there was a substantial understatement of income, declared value excess profits, and excess profits taxes by Arctic, he has sustained this burden. In our view Arctic's failure to report a large part of its profits for the year 1944 is clear and convincing evidence of a fraudulent purpose, cf. *David J. Pleason*, 22 T.C. 361 (1954), as is the fact that its books and records for that year were obviously incorrect and intentionally false, cf. *Jack M. Chesbro*, 21 T.C. 123 (1953). While the dominant motive in not recording all of Arctic's cash receipts during 1944 may have been to evade Department of Agriculture regulations with respect to the rationing of critical ice cream ingredients, "the resultant act, whatever the motive, was in fact an attempt to defraud the Government of taxes legally due." *United States* v. *LaFontaine*, 54 F. 2d 371, 374 (D. Md. 1931).

As to the year 1945, the issue of fraud is moot since we have found as a fact that Arctic is entitled to increased deductions for purchases in that year in excess of its income. As there are no deficiencies to which the fraud penalty may attach, the year 1945 is thus closed by the statute of limitations.

4. *Fraud With Respect to Arctic for 1946.*—For the year 1946 Arctic was convicted of willfully attempting to evade its income tax, by means of filing a false and fraudulent income tax return, in violation of section 145 (b) of the Internal Revenue Code of 1939.[4] This conviction necessarily carries with it the ultimate factual determination that the resulting deficiency for 1946 was "due to fraud with intent to evade

---

[4] SEC. 145. PENALTIES.

(b) * * * ATTEMPT TO DEFEAT OR EVADE TAX.—Any person * * * who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

tax" within the meaning of section 293(b) of the 1939 Code.[5] *John W. Amos*, 43 T.C. 50 (1964), *Lefkowitz* v. *Tomlinson*, 334 F. 2d 202 (C.A. 5, 1964). It is not material that Arctic's conviction was based upon a guilty plea, because for purposes of applying the doctrine of collateral estoppel, as well as for other purposes, there is no difference between a judgment of conviction based upon such a plea and a judgment of conviction rendered after a trial on the merits. See 22 C.J.S., Criminal Law, sec. 424(1), and the many cases there cited. Indeed, it is our view that, "where the prior conviction resulted from a plea of guilty there [is] * * * a greater warrant for application of the doctrine [of collateral estoppel] since the defendant has admitted the truth of the charges contained in the indictment." *United States* v. *Schneider*, 139 F. Supp. 826, 829 (S.D.N.Y. 1956); *United States* v. *Ben Grunstein & Sons Co.*, 127 F. Supp. 907, 909 (D. N.J. 1955). See also *United States* v. *Bower*, 95 F. Supp. 19, 21 (E.D. Tenn. 1951); *United States* v. *American Packing Corp.*, 113 F. Supp. 223, 225 (D. N.J. 1953); *United States* v. *American Precision Products Corp.*, 115 F. Supp. 823 (D. N.J. 1953); and *United States* v. *Accardo*, 113 F. Supp. 783 (D. N.J. 1953), affirmed per curiam 208 F. 2d 632 (C.A. 3, 1953), certiorari denied 347 U.S. 952.

The indictment to which Arctic pleaded guilty charged that for the calendar year 1946 it had willfully and knowingly filed a false and fraudulent income tax return alleging that the corporation had sustained a loss for that year, whereas in fact, it was known that it had substantial income upon which a tax was due and owing to the United States. It is well settled that a plea of guilty means "guilty as charged in the indictment," and that such a plea is a conclusive judicial admission of all of the essential elements of the offense which the indictment charges. 22 C.J.S., Criminal Law, secs. 424(2) and 424(3). *Kercheval* v. *United States*, 274 U.S. 220, 223 (1927). An essential element of the offense charged by the indictment against Arctic was the filing of a false and fraudulent income tax return for the year 1946. Arctic's plea of guilty to this indictment was therefore a conclusive judicial admission that its return for 1946 was false and fraudulent and that the deficiency in tax which was the necessary result of its being filed was due to fraud with intent to evade tax. Cf. *John W. Amos, supra*.

It is the essential principle of the doctrine of collateral estoppel that only one opportunity be given, in the normal course, to litigate an issue. *Fairmount Aluminum Co.*, 22 T.C. 1377, 1379 (1954). The factual question whether or not Arctic filed a false and fraudulent income tax return for 1946 with intent to evade tax was a matter

---

[5] SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

(b) FRAUD.—If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid * * *

placed in issue by the indictment in the prior criminal proceeding. This issue of fact was judicially admitted by Arctic's plea to the indictment. Although it is true that no evidence was introduced in support of the conclusion of guilt reached by the court (since none was required because of the plea), this is not material; the judgment rendered was nevertheless a judgment on the merits sufficient for purposes of collateral estoppel to preclude relitigation of issues determination of which was essential to the conclusion reached. Cf. *Last Chance Min. Co.* v. *Tyler Min. Co.*, 157 U.S. 683, 691 (1895), to the effect that: "The essence of estoppel by judgment is that there has been a judicial determination of a fact, and the question always is, has there been such a determination and not upon what evidence or by what means it was reached."

5. *Fraud and Statute of Limitations With Respect to Lencione.*— Respondent determined that a part of the deficiencies in Lencione's tax for each of the years 1944, 1945, and 1946 was due to fraud with intent to evade tax. The burden of proving this was, of course, upon respondent. While the evidence does show that a part of Arctic's suppressed cash receipts was not used to purchase black-market materials, and that a part of this sum was retained by Lencione personally, we are not persuaded that these retained amounts should be treated as taxable distributions to him. Prior to and during the years at issue Lencione made a number of bona fide advances of money to Arctic. Since at no time during the period 1944–46 did the amounts retained by Lencione exceed the sum of these advances, we are unwilling to find on this record that these retained sums were anything more than repayments of Lencione's advances. Respondent has thus failed to establish fraud with respect to Lencione for the years 1944–46. The assessment and collection of deficiencies in tax asserted against Lencione are therefore barred by the statute of limitations.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

WITHEY, *J.*, dissents.

———

PIERCE, *J.*, dissenting: I respectfully dissent from the Court's decision in this case, for the reasons which I have rather extensively set forth in my dissenting opinion in the concurrently considered case of *John W. Amos*, 43 T.C. 50.

———

DRENNEN, *J.*, dissenting: I respectfully dissent for the reasons stated in the dissenting opinions filed in *John W. Amos*, 43 T.C. 50 (1964). My disagreement with the conclusion reached in this case, where the issue of fraud has not even been litigated in any

court, is more pronounced than my disagreement with the conclusion reached by the majority in *John W. Amos, supra,* where the issue of criminal fraud was decided after a trial.