GLENN D. BROOKS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4370–80.     Filed March 8, 1984.

Glenn D. Brooks, pro se.
*Elaine Moriwaki,* for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in and additions to tax as follows:

| Year | Deficiencies | Additions to tax sec. 6653(b)[1] |
|------|--------------|----------------------------------|
| 1967 | $4,568.92 | $2,284.46 |
| 1968 | 4,237.88 | 2,118.94 |
| 1969 | 13,636.67 | 6,818.34 |
| 1970 | 51,314.19 | 25,657.10 |
| 1971 | 10,762.24 | 5,381.12 |
| 1972 | 24,442.05 | 12,221.03 |
| 1973 | 14,620.14 | 7,310.07 |

On the third date on which the case was set for trial, following two continuances requested by petitioner, petitioner failed to appear. The Court declared a default and allowed respondent to present evidence with respect to the additions to tax for fraud. Petitioner has moved to set aside the default, claiming that he did not appear because he thought the case was settled. For reasons set forth below, the motion to set aside the default is denied, and a decision will be entered in favor of respondent for the full amount of the deficiencies and additions to tax.

### FINDINGS OF FACT

Petitioner was a resident of Bishop, Calif., during the years in issue and at the time that his petition herein was filed. For the years 1966 through 1973, petitioner filed joint Federal income tax returns with Betty H. Brooks.

Sometime prior to August 7, 1973, respondent commenced an investigation into the tax liability of petitioner. During the course of that investigation, respondent's agents attempted to interview petitioner. On the first attempt, petitioner claimed to be someone other than Glenn D. Brooks. Ultimately, however, the agents interviewed petitioner with respect to taxable and nontaxable sources of income. Petitioner stated that at some point in time he found some money, but he refused to tell the investigating agents how much he found or to identify an alleged witness to the find. Petitioner stated that he had lived frugally and saved money and that he had received small gifts from his parents. He indicated that he had deposited some or all of the money found, saved, and received as gifts into bank accounts, but he made inconsistent state-

ments as to when the amounts were deposited. He refused to respond to questions concerning the largest amount of cash he ever had on hand. He initially agreed to allow respondent's agents to review his books and records, but he then refused to do so.

The interview with petitioner and petitioner's failure to produce books and records from which his tax liability could be determined prompted respondent's agents to obtain various third-party records and prepare various schedules, which were finally incorporated into an analysis of petitioner's net worth and expenditures. In that analysis, the sum of $1,000, which had been mentioned by petitioner during the interview by respondent's agents, was used as the beginning cash on hand. Respondent's analysis did not include any greater sum for cash on hand because review of petitioner's bank accounts failed to confirm petitioner's statements that he had found a large amount of cash that was subsequently deposited in bank accounts. The net-worth analysis prepared by respondent concluded that petitioner's net worth had increased steadily from $93,889.31 on December 31, 1966, to $413,320.37 on December 31, 1973. This analysis was the basis for the notice of deficiency sent to petitioner on January 25, 1980, that determined the deficiencies and additions to tax set forth above.

On June 8, 1976, a 5-count indictment was filed in the U.S. District Court for the Eastern District of California, charging petitioner with violations of section 7201 (criminal tax evasion). Count 5 of the indictment charged petitioner with violation of section 7201 for the taxable year 1973. On November 8, 1976, petitioner entered a plea of guilty to count 5 of the indictment, and on December 20, 1976, he was convicted of violation of section 7201 for the taxable year 1973.

The petition herein was filed on March 27, 1980. Respondent's answer, attached to which was a copy of the net-worth analysis, was filed May 9, 1980. Petitioner's reply was filed on June 3, 1980. Both the petition and the reply filed on behalf of petitioner were signed by Norman H. McNeil (McNeil) and Clyde R. Maxwell as counsel for petitioner. Maxwell had represented petitioner during the criminal tax case.

On February 4, 1982, respondent's first request for admissions was served on McNeil as counsel for petitioner. Contem-

poraneously, respondent served on McNeil interrogatories that called for further information concerning petitioner's contentions with respect to any responses that were not an unqualified admission. Among the admissions requested were the following:

16. During the period in question, petitioner engaged in the sale of emeralds.

17. During the period in question, petitioner received gross income of at least $28,917.76 from the sale of emeralds, as reflected by the photocopies of nine checks (front and back copies) attached * * *

18. During the period in question, petitioner owned and operated a moving and storage business.

19. Petitioner operated his moving and storage business under the name Bishop Moving and Storage (hereinafter Bishop).

Other admissions requested dealt with petitioner's business of farming or horse ranching, nontaxable receipts, cash accumulations, liabilities to third persons as of the end of each year in issue, and the accuracy of other items included in respondent's net-worth analysis. No responses to respondent's first request for admissions were ever filed with the Court as required by Rule 90(c). Untimely responses served on respondent on or about April 15, 1982, admitted the above facts, but the answers to interrogatories failed to provide any specific information concerning the alleged cost of the emeralds, the amount of any nontaxable receipts or money found, or outstanding liabilities not taken into account in respondent's analysis.

On February 26, 1982, the parties were served with notice setting the case for trial in Los Angeles, Calif., on May 17, 1982. Petitioner, through his counsel, moved for continuance of the trial, representing among other things, that "an independent accounting by petitioner [with respect to respondent's net-worth analysis] is incomplete." The motion for continuance was granted.

On February 7, 1983, the parties were served with notice setting the case for trial in Los Angeles, Calif., on May 9, 1983. On February 23, 1983, respondent's second request for admissions was served on McNeil as counsel for petitioner. The matters that petitioner was requested to admit included the above-stated facts concerning his conviction, the manner of preparation of his income tax returns, and various transactions reflected in the net-worth analysis prepared by respon-

dent. No response to the request for admissions was ever filed, and, pursuant to Rule 90(c), the matters set forth therein are deemed admitted and are so found.

On April 4, 1983, petitioner, through McNeil, filed a motion for continuance of the May 9 trial date, representing that petitioner had been unavailable to his retained accountant and counsel because he had been incarcerated on a misdemeanor conviction related to his moving business. The motion alleged in part:

4. It is essential for petitioner's case that he and his accountant screen the records to isolate trust fund liabilities for 1966 to 1973, inclusive. Petitioner was remiss in not following through with this obligation prior to his incarceration and providing for past due accounting fees but the incarceration effectively prevented him from meeting the accountant. On petitioner's behalf, he is scheduled to commence work with the accountant on April 6, 1983.

5. Counsel for petitioner visited with him on two separate occasions in the Inyo County Jail for the purposes of ascertaining if on-going factual development was feasible and to resolve the serious problem of continued representation without payment of fees. The jail restrictions made further work on the case untenable and the court would not release petitioner for meetings with the accountant. The incarceration also depleted petitioner's liquid asset position. Nonetheless, petitioner is on notice that the filing of this motion is the last act present counsel will take on his behalf.

The motion for continuance was heard on May 9, 1983, in Los Angeles, before the Honorable Charles R. Simpson, Judge. The motion for continuance was granted, but only after the following colloquy:

THE COURT: This is a terrible record. And, quite frankly, it looks to me like you're the one responsible for it.

I put aside the fact that you were in jail for six months. It looks to me like, even aside from the time that you were in jail, there has been a complete lack of cooperation.

Now, quite frankly, we simply can't tolerate this kind of a proceeding. The law allows you an opportunity to challenge the deficiency that the government claims you owe, but while you're given that opportunity the government must postpone the collection of its tax.

So, under the law, the time in which you can challenge that deficiency is limited. You simply cannot avoid the payment of that deficiency by procrastination.

And under many circumstances I would simply say to Mr. McNeil, "You've had your chance for a continuance, you've had ample opportunity to get this case ready for trial, if you're not ready for trial now it's your fault,

and we're going to trial. And you'll have to do the best you can." Which would probably mean you would lose and be held liable for the tax.

Now, if you're willing, and if you'll get up here in Court and tell me you're willing to cooperate with your lawyer and get this case ready for trial in six months, I will consider continuing it.

But I want it understood that I will not give any continuance at all unless you stand up in this Court and tell me you're willing to start working with your lawyer and get this case ready for trial in the next six months.

Now, are you willing to do that?

MR. BROOKS: Yes, Your Honor. May I be heard?

THE COURT: Yes.

MR. BROOKS: My diligent purpose for working at this—I made a 600-mile round trip and I have set appointments with my accountant and I have spent two days with him in his office already filing returns and going over records. I spent two days there, I've set future appointments with my accountant and with his assistant to diligently go over the other records and taxes.

\*    \*    \*    \*    \*    \*    \*

And I will diligently promise Your Honor that I will work on this with every moment that I have with all sincerity and diligence to complete the computations for Ms. Moriwaki with full cooperation and time to devote to her and whatever she needs to cooperate in full detail with both my attorney and Ms. Moriwaki to settle this matter and get it behind and behind the Tax Court, because it's been an extremely financial, physical, and mental burden on me over the years and I also want to settle it as soon as possible.

And I would promise Your Honor a full, diligent effort on my part to do so.

THE COURT: Now, obviously it's not up to me to become involved in the question of what attorney you use, but I would think if you can work on an arrangement with Mr. McNeil it would facilitate your preparing the case because he has a good deal of background in it.

If you bring a new attorney in to the case, it's going to create some problems.

I will put the case over, and I will try to set it down in the fall at the earliest—I'll give you at least until October. And we'll set it down either in October or as soon thereafter as we can.

But I want to emphasize, Mr. Brooks, that there will be no further continuances, so don't have Mr. McNeil or some other attorney come in here and say, "Well, we haven't had time to get ready because we haven't had the papers or we haven't had the cooperation."

Or don't have a new attorney come in and say, well, he hasn't had time to get ready. If you're going to switch attorneys, you'd better do it right now so that he'll have ample opportunity because there will be no further continuances.

MR. BROOKS: I understand, Your Honor, and I will diligently approach this situation immediately with every effort to start to work on it.

On July 14, 1983, the parties were served with notice setting case for trial in Los Angeles, Calif., on October 11, 1983. That notice included the following statements:·

The calendar for that Session will be called at 10:00 a.m. on that date and both parties are expected to be present at that time and be prepared to try the case. YOUR FAILURE TO APPEAR MAY RESULT IN DISMISSAL OF THE CASE AND ENTRY OF DECISION AGAINST YOU.

Your attention is called to the Court's requirement that, if the case cannot be settled on a mutually satisfactory basis, the parties, *before trial,* must agree in writing to *all* facts and *all* documents about which there should be no disagreement. Therefore, the parties should contact each other promptly and cooperate fully so that the necessary steps can be taken to comply with this requirement. YOUR FAILURE TO COOPERATE MAY ALSO RESULT IN DISMISSAL OF THE CASE AND ENTRY OF DECISION AGAINST YOU.

On August 4, 1983, petitioner's counsel filed a motion for leave to withdraw, stating, among other things, that the only work completed with the accountant was preparation of petitioner's 1982 return, "no provision for accounting or legal fees has been made and, equally important, petitioner has made no effort to prepare for trial." The motion for leave to withdraw was granted on August 29, 1983. On September 7, 1983, the Court sent to petitioner a letter reminding petitioner of the trial date and of his obligation to meet with respondent's counsel with respect to stipulations for trial. The letter contained the following statement:

As you will recall, during the proceedings on May 9, 1983, Judge Simpson admonished you to cooperate with counsel and to prepare your case, which would be set in October, and that there would be no further continuances. Because your counsel has recently withdrawn, I am reiterating Judge Simpson's warning. You should be prepared to proceed on October 11, with or without new counsel. No continuance on the basis of absence of counsel or new employment of counsel will be granted.

From May to September 1983, petitioner did nothing to prepare this case for trial. On October 7, 1983, petitioner and McNeil met with respondent's counsel and discussed settlement of the case. No settlement was in fact reached. At that time, McNeil was representing petitioner only with respect to negotiations for settlement, and petitioner had not made any attempt to prepare the case for trial and had not retained any counsel for trial. As of that time, it was not possible for him to

be ready for trial on October 11 or at any time during the trial session commencing on that date.

The case was called for trial on October 11, 1983. Petitioner was not present. McNeil was present in the courtroom in relation to another case in which he was counsel of record. Counsel for respondent indicated to the Court that respondent was ready for trial, that McNeil had indicated to her that petitioner apparently was unaware that his presence was required that morning because he was under the impression that the case was settled, and that respondent's position was that the case was not settled and that petitioner's presence was expected. At McNeil's request, respondent's counsel suggested a trial date the following week. The Court indicated that it appeared that the session would conclude during the week of October 11 because there were not enough cases remaining for trial to justify extending the trial session to the following week, and that the case would be set for trial after the balance of the calendar call. McNeil left the courtroom. At the conclusion of the calendar call, this case was set for trial on October 14, 1983, at 9 a.m.[2]

On the evening of October 11, 1983, McNeil spoke to petitioner. On that date, respondent's counsel notified petitioner of the time set for trial in writing and by telephone message left at petitioner's residence. On the evening of October 13, 1983, McNeil again spoke to petitioner. Petitioner acknowledged receipt of messages from respondent's counsel, but advised McNeil that he would not appear for trial on October 14. Petitioner did not retain McNeil to represent him in relation to trial of this case but asked that McNeil appear on the following morning to attempt to settle the case or to obtain a continuance of the trial.

On October 14, 1983, the case was called for trial. Respondent's counsel was ready for trial and had present two witnesses who had traveled from Bakersfield, Calif., which is approximately 100 miles from Los Angeles. McNeil did not enter an appearance because he did not represent petitioner "except for settlement purposes." He made the following statement on behalf of petitioner:

---

[2]The Court's records show that Oct. 14, 1983, was the last day of the trial session because all business of the Court requiring presence of a judge, trial clerk, and reporter in Los Angeles had been concluded.

Mr. Brooks has indicated to me as early as Tuesday evening and as late as last night when I spoke to him again that he did not understand that his appearance was required, either on Tuesday for calendar call or at any subsequent sitting, because he understood his case had been settled.

Because respondent took the position that the case was not settled and could not be settled, McNeil requested a continuance. The continuance was denied. Respondent moved to default petitioner with respect to the deficiencies in tax and presented evidence with respect to the additions to tax for fraud. The Court set January 12, 1984, as the due date for briefs from the parties.

Petitioner, thereafter, moved to set aside the default, and his motion was set for hearing in Phoenix, Ariz., on December 5, 1983. During the hearing, petitioner's arguments were primarily directed to his whereabouts on October 14 and the legal fees requested by McNeil. The parties were instructed to file further affidavits or memoranda in support of their respective positions by January 12, 1984. Petitioner was specifically directed to attach to his filings affidavits of proposed witnesses and either copies of documentary evidence or an accounting analysis of his position. Petitioner's further filings were received January 19, 1984. As of that time, he still had neither retained counsel nor delivered his records to an accountant, and neither copies of documentary evidence nor an accounting analysis was presented. He stated:

I am requesting your Honor to set aside the default and to set a court date in Los Angeles with a minimum of 90 days in the future or longer so I can have the accounting portions of my case completed with Mr. Conners in Las Vegas and that I can have witnesses and documents prepared and fee arrangements with an attorney completed.

Petitioner's filings do not address the evidence of fraud presented by respondent at trial. At no time has petitioner justified the failure to respond to requests for admissions or the failure otherwise to prosecute the case properly or to be prepared for trial.

The gross income of $28,916.76 received by petitioner from the sale of emeralds, admitted by him as aforesaid, was never reported by petitioner on his tax returns for the years in question. In each of the years 1967 through 1973, petitioner claimed that a refund of tax was due him, except for the year

1970, when he paid a tax of $2,249.16. Despite a 7-year succession of claimed business losses or nominal reported income, petitioner purchased substantial amounts of real property for $232,000, purchased personal property (used in his trade or business) for $103,312.63, and accumulated over $54,642 in interest income from his bank accounts without incurring any business or personal indebtedness on which he paid interest.

The gross receipts reported by petitioner on his tax returns and the unreported gross income received by him in the years 1967 through 1973 are as follows:

| Year | Reported gross receipts | Unreported gross income |
|------|------------------------|-------------------------|
| 1967 | $38,542.12 | $19,996.40 |
| 1968 | 28,750.64 | 18,162.69 |
| 1969 | 25,982.20 | 44,372.41 |
| 1970 | 48,056.28 | 92,599.97 |
| 1971 | 35,905.59 | 33,552.94 |
| 1972 | 27,553.43 | 60,592.40 |
| 1973 | 17,513.41 | 68,647.55 |

### ULTIMATE FINDINGS OF FACT

At no time has petitioner intended properly to prosecute this case to trial. His sole purpose in this proceeding has been to delay satisfaction of his tax liabilities and to obtain a settlement by dilatory tactics and obfuscation.

Petitioner underpaid his income taxes for each of the years 1967 through 1973, and the underpayments were due to fraud.

### OPINION

*A. Default and dismissal.*

Rule 123 provides as follows:

(a) Default: When any party has failed to plead or otherwise proceed as provided by these Rules or as required by the Court, he may be held in default by the Court either on motion of another party or on the initiative of the Court. Thereafter, the Court may enter a decision against the defaulting party, upon such terms and conditions as the Court may deem proper, or may impose such sanctions (see, e.g., Rule 104) as the Court may deem appropriate. The Court may, in its discretion, conduct hearings to ascertain whether a default has been committed, to determine the decision to be entered or the sanctions to be imposed, or to ascertain the truth of any matter.

(b) Dismissal: For failure of a petitioner properly to prosecute or to comply with these Rules or any order of the Court or for other cause which the Court deems sufficient, the Court may dismiss a case at any time and enter a decision against the petitioner. The Court may, for similar reasons, decide against any party any issue as to which he has the burden of proof; and such decision shall be treated as a dismissal for purposes of paragraphs (c) and (d) of this Rule.

(c) Setting Aside Default or Dismissal: For reasons deemed sufficient by the Court and upon motion expeditiously made, the Court may set aside a default or dismissal or the decision rendered thereon.

(d) Effect of Decision on Default or Dismissal: A decision rendered upon a default or in consequence of a dismissal, other than a dismissal for lack of jurisdiction shall operate as an adjudication on the merits.

Rule 149(a) provides as follows:

(a) Attendance at Trials: The unexcused absence of a party or his counsel when a case is called for trial will not be ground for delay. The case may be dismissed for failure properly to prosecute, or the trial may proceed and the case be regarded as submitted on the part of the absent party or parties.

## (1)

Most of petitioner's presentation in support of his motion to set aside the default arising by reason of his nonappearance on October 14 is addressed to an attempt to excuse his nonappearance. We are not satisfied, however, that petitioner's explanations constitute an excuse. He states that as of October 7, he thought that his case was settled and that as of October 13, he was unable to arrange transportation from his worksite to Los Angeles. It appears, however, that petitioner was advised on October 11, after he had failed to appear for the calendar call, that the case was not settled and that it would be set for trial. Thereafter, petitioner became unavailable until the 13th. We are not convinced that his unavailability and any difficulty in traveling to Los Angeles in time for trial on the 14th were unavoidable. On October 14, McNeil stated that he had spoken to petitioner on Tuesday, which was the 11th. Subsequent affidavits of McNeil and petitioner carefully avoid any discussion of what was said during that conversation. At the hearing on December 5, respondent's counsel made references to this communication between petitioner and his counsel on the 11th, but petitioner neither denied nor explained his failure to make arrangements to appear in Court as a result of that notice.

We are convinced that the result here would be the same even if petitioner had appeared in Court at the calendar call on October 11 or at trial on October 14. From the prior and subsequent statements of McNeil and from petitioner's own filings in support of his motion to set aside the default, it is obvious that petitioner was not prepared for trial and could not have been prepared to present the evidence that he now claims that he will have "in a minimum of 90 days or longer." At that point, the petition should have been and would have been dismissed under Rule 123(b) for failure of petitioner properly to prosecute his case.

A similar situation existed in *Freedson v. Commissioner*, 67 T.C. 931 (1977), affd. 565 F.2d 954 (5th Cir. 1978). In that case, also, Freedson had obtained two continuances and had engaged in a variety of stalling tactics over a period of more than 3 years. Freedson had been warned that no further continuances would be granted, and a further motion for continuance, made at the calendar call on May 10, 1976, was denied. The case was set for May 14, 1976. As of that time, Freedson had not stipulated any facts, subpoenaed any records, or otherwise prepared for trial. He again moved for continuance, and respondent moved to dismiss for failure properly to prosecute. This Court stated:

We conclude that Rule 123(b) requires us to balance potentially rival considerations. In general it requires this Court to reconcile the policy in favor of having cases heard on their merits with the policy in favor of avoiding harassment to the defending party arising from unjustifiable delay. * * * In the context of Federal tax litigation, we observe that respondent has the obligation to collect taxes and that he has the right to obtain judicial resolution of tax disputes within a reasonable period of time.

* * * Despite repeated warnings and adequate advance notice, when the time came for trial after his third requested continuance had been denied, Freedson was simply unprepared and refused to put on his case. He apparently gambled unsuccessfully that he could obtain relief from the Court of Appeals. By this time, 7 years had passed since the time petitioners' taxes were due. "There must come a time when even at some risk of error, a court is justified in accepting as conclusive a series of apparent subterfuges." *Katz v. Commissioner*, 188 F.2d 957, 959 (2d Cir. 1951) (L. Hand, J.), affg. a Memorandum Opinion of this Court. The time has come in these cases. We are convinced of the reality of subterfuge and delay on the part of petitioners, with ensuing detriment to respondent's right to have his case tried and petitioners' taxes finally determined and paid.

\*     \*     \*     \*     \*     \*     \*

These cases now before us are unusual in that Freedson was present for trial. Even though dismissal for failure properly to prosecute will normally arise where a party fails to appear at trial, this Court has, under Rule 123(b), previously dismissed a case involving an appearing petitioner. *Robert E. Wade*, [T.C. Memo. 1975–236] 34 T.C.M. 1023, 44 P–H Memo T.C. par. 75,236 (1975). The Court acted in a similar manner under our former Rules. *Montgomery v. Commissioner*, 367 F.2d 917 (9th Cir. 1966).

After viewing the events in this case, we think the record contains "ample justification for believing that the taxpayer had pursued a studied course of defiance of the government and its taxing authorities." (Fn. ref. omitted.) *Montgomery v. Commissioner, supra* at 920. As the Ninth Circuit Court of Appeals in the *Montgomery* case went on to state:

"If a substantial body of Americans displayed the taxpayer's disdainful attitude toward tax obligations, our government would be rendered powerless to provide the service and protection which its citizens have come to expect and enjoy. In seeking to impose more delay upon that which his own lack of responsibility had already created, the taxpayer urged the Tax Court, in effect, to confer upon him a benefit which nearly all those who support the nation cannot enjoy and which they are usually too proud and respectable to seek."

*Montgomery v. Commissioner, supra* at 920. We refuse to confer this benefit upon petitioners. [67 T.C. at 935–936, 938; citations omitted.]

In this case, of course, we are dealing with petitioner's liability for the years 1967 through 1973; payment of that liability was due on dates ranging from 16 to 10 years prior to the time that our decision in this case will be final.

In *Montgomery v. Commissioner*, 367 F.2d 917 (9th Cir. 1966), the Court of Appeals for the Ninth Circuit reviewed a taxpayer's motion to set aside the dismissal for lack of prosecution granted after denial of a motion for continuance. The Court stated:

The grounds which were set forth in support of the motion to vacate the order of dismissal were essentially the same as those which are claimed to have required that the Tax Court grant taxpayer's motions for continuance. If the denials of a continuance were justified, then there is no sound basis for the attack upon the order of dismissal. There is inherent power in a court, acting within the "permissible range" of its discretion, to dismiss a civil action for lack of prosecution. Link v. Wabash Railroad Co., 370 U.S. 626, 633, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). [367 F.2d at 919.]

(2)

Because of the issue of fraud in this case, as to which respondent has the burden of proof (see *infra*), our decision

had not been entered at the time of petitioner's motion. A decision against petitioner as to the deficiencies, as to which he has the burden of proof (Rule 142(a)), will, however, be treated as a dismissal. Rule 123(b). Applying the standards applicable to dismissal for failure to prosecute properly, we conclude that such sanction is appropriate and necessary in this case. See *Kung v. Fom Investment Corp.*, 563 F.2d 1316 (9th Cir. 1977); *California Molasses Co. v. C. Brewer & Co.*, 479 F.2d 60 (9th Cir. 1973); *Fitzsimmons v. Gilpin*, 368 F.2d 561 (9th Cir. 1966); *O'Brien v. Sinatra*, 315 F.2d 637 (9th Cir. 1963).

We have also, however, separately considered petitioner's motion to set aside the default in failing to appear for trial in relation to the determination of fraud. In this regard, Rule 123(c) is patterned after rule 55(c), Federal Rules of Civil Procedure. See note to Rule 123(c), 60 T.C. 1130. Cases in which judgment against a party has resulted from his default in failing to appear usually involve defaults by defendants. To the extent that petitioner here seeks to avoid the additions to tax for fraud, his situation may be analogous to that of a defendant. In any event, in ruling on petitioner's motion, we have also applied the criteria for setting aside defaults, viz, (1) excuse for nonappearance, and (2) meritorious defense. See *Madsen v. Bumb*, 419 F.2d 4 (9th Cir. 1969); *Tri-Continental Leasing Corp. v. Zimmerman*, 485 F. Supp 495 (N.D. Cal. 1980); C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d., sec. 2697 (1983). Even if we were convinced that petitioner's explanation of his failure to appear at the calendar call and for trial were other than a subterfuge, we conclude that he has failed to establish the existence of a meritorious defense to the additions to tax for fraud.

Petitioner's filings in support of his motion to set aside the default do not attempt to explain the inconsistent statements of petitioner testified to by respondent's witnesses.[3] He does not address his unreported income from the sale of emeralds. He tenders an affidavit, dated January 16, 1984, of a former employee, Richard L. Graves, who states that in his opinion

---

[3]Petitioner's former counsel, McNeil, had the opportunity to cross-examine respondent's witnesses at the time of trial but declined to do so because he had not been retained and would not, therefore, enter an appearance. Although he claimed to have ordered a transcript prior to Dec. 5, 1983, petitioner has not addressed in his filings the evidence presented at trial. Briefs on that aspect of the case were due Jan. 12, 1984, and none has been filed on behalf of petitioner.

petitioner could not have earned the unreported income determined by respondent. The affidavit further states:

In the warehouse we had a large safe owned by the Railway Express of which I had the combination. Mr. Brooks kept documents, bill of ladings, PUC reports, etc. in it. *During Mr. Brooks divorce* he had the combination changed as he pulled all his money from the banks and placed cash into the safe until his divorce was settled. I was told there was in excess of $250,000.00. [Emphasis supplied.]

Although it is not clear from the record when petitioner was actually divorced, he and Betty Brooks filed joint returns at least through the years in issue.

The balance of the affidavits submitted by petitioner purports to confirm his story of a cash hoard that would explain the bulges in petitioner's net worth and expenditures set forth in respondent's analysis that were not explained by reported income. Petitioner presented a copy of an affidavit by his former wife dated February 3, 1978. The affidavit states that in December 1965, prior to their marriage, and again in 1968, after a period of separation, she and petitioner counted large amounts of cash, mostly in $100 bills, kept in a safe in petitioner's office. She estimates the amount as $200,000 in 1965 and $290,000 in 1968. She also states that substantial deposits of cash into savings accounts during their marriage came from this source, but analysis of petitioner's savings accounts negated large cash deposits. Because the former Mrs. Brooks was a party to the joint returns in issue, her affidavit must be regarded with caution. The affidavit, of course, would not be admissible at a trial. The witness apparently resides in Mexico, and there is substantial doubt indicated in the record as to whether she would be present at trial. In any event, the statements in her affidavit concerning her knowledge of a cash hoard are inconsistent with one of the purported explanations given for the alleged cash hoard, i.e., an attempt to keep the assets out of her reach by withdrawals from banks during a divorce.

Petitioner also tenders copies of two statements by his mother. The first, notarized September 18, 1975, was apparently obtained by petitioner prior to the criminal indictment. It states that in the years 1967 and 1968, she had knowledge of a cash hoard held by her son "due to the fear of a pending possible divorce, and or pending law suits, which were upcom-

ing." Both petitioner and respondent, however, have attached to their respective filings a copy of an affidavit of petitioner's mother dated December 12, 1975. The December 1975 affidavit disclaims knowledge of various possible sources of nontaxable income and shows that her information concerning the alleged cash hoard is entirely inadmissible hearsay. It states:

I have not been to his office in Bishop, California, and consequently I have not seen any large amounts of currency or cash, and I have no knowledge of any large amounts of currency or cash in my son's possession. Except, that I heard, the source of which I cannot recall, that during his divorce he had withdrawn all the money from his bank accounts in fear that it would be attached during the divorce proceedings and other legal proceedings. Glenn's father, George P. Brooks, Bishop, California, called me on the telephone, but I cannot recall the period of time, and told me that our son, Glenn, had large sums of money in currency in the safe. He told me that Glenn had told him it was about $350,000.

Petitioner's filings include an affidavit of his father dated January 12, 1984 (the new affidavit), which begins by disavowing an affidavit given December 2, 1975, to special agents of respondent (the prior affidavit). The new affidavit describes the statements in the prior affidavit as "from a drunken condition and were of items I don't even recall at this time." The new affidavit asserts that, during petitioner's divorce from his former wife, petitioner told the senior Mr. Brooks that he had a large amount of cash, and the senior Mr. Brooks suggested that the money should be taken "out of banks or locations where they could be attached by his wife during the divorce proceedings." The affidavit is vague as to dates, is for the most part hearsay, and contains many inadmissible and irrelevant conclusions. It is directly contrary to the prior affidavit, which is attached to respondent's filing in opposition to the motion to set aside default and includes the following statement:

I was never present with Glenn when he had any large amounts of currency or cash, and I was never present when he counted any currency. I have never had any actual knowledge of an amount of currency or cash on hand that Glenn had. He never told me how much cash on hand he had.

Finally, petitioner alleges that he would testify in his own behalf, but he does not set forth any specifics of his own testimony.

Even assuming that each of the proposed witnesses identified by petitioner appeared at trial and testified in accordance with his or her last affidavit, and that petitioner testified in the same vein, we would not find their statements persuasive. Cross-examination of each of the witnesses on the basis of interest and inconsistent statements would at least render those statements useless and might well provide the basis for charges of perjury. Petitioner has failed to show that there is any merit to his claims requiring trial or that injustice results from declining to disregard his default.

(3)

To the extent that considerations of justice are inherent in the exercise of the Court's discretion to dismiss a case or to refuse to set aside a default, we have also considered the prejudice to respondent, to the Court, and to other taxpayers. Respondent's agents and counsel obviously spent many years developing and preparing this case. They were ready for trial on October 14, and the agents who were witnesses had traveled a substantial distance to be present. Respondent and his counsel have a voluminous case load, and constant delays unreasonably increase the burden of dealing with that case load. Any discussions of settlement in this case were apparently predicated on the desirability of avoiding the burdens of trial and not on any showing by petitioner that any of his claims might prevail. Respondent has now borne the burdens of trial and briefing, and it would be unreasonable to require repetition of those processes.

The imposition on the Court is also a matter to be considered. Our well-publicized case load is attributable not merely to protesters and tax shelters, but also to parties in other types of cases who depend upon obfuscation and delay to postpone or discount their liabilities. The Office of the Court is in Washington, D.C., but trial sessions are held in various cities, including Los Angeles, for the convenience of the parties. Secs. 7445, 7446; Rules 10, 140. When cases are at issue, they are scheduled on the next available calendar in the place requested for trial, generally in order of filing, and notice of trial is sent. See Rule 132. The judge, trial clerk, and reporter are

assigned,[4] and the courtroom space is reserved. When a case set for trial is not resolved during a trial session in which time has been set aside for it, a substantial waste of the Court's resources results.

Delays also affect other taxpayers who are awaiting the opportunity to have their cases heard. Only a certain number of cases can be placed on any particular trial calendar.[5] Each time that a case scheduled for trial does not proceed, time is wasted that could have been spent on other cases if they could have been scheduled. Respondent's counsel is required to spend time preparing cases for trial which could be spent working with taxpayers on other cases and attempting to settle them. These unnecessary burdens on the system are unreasonable and unfair from the standpoint of everyone involved. See *Montgomery v. Commissioner, supra*; see also *Hatfield v. Commissioner*, 68 T.C. 895, 899 (1977).[6]

After considering all of these circumstances and controlling factors, we conclude that the appropriate exercise of our discretion in this case is as follows:

(a) The deficiencies determined by respondent for each of the taxable years 1967 through 1973, as to which petitioner has the burden of proof, are decided against petitioner by reason of petitioner's failure properly to prosecute the case.

(b) The motion to set aside the default is denied, and petitioner's liability for the additions to tax for fraud is determined on the basis of the evidence now in the record.

## B. The additions to tax for fraud.

The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection

---

[4]These personnel are, of course, also responsible for completing work arising from prior sessions and preparing for and traveling to later sessions. In this situation, on Oct. 24, 1983, the judge was due in Denver, Colo., and the trial clerk was due in New York, N.Y., for other scheduled trial sessions.

[5]The initial calendar for the Oct. 11, 1983, Los Angeles session included 97 cases, in 70 groups, estimated to take 385 hours of trial time. The cases set for trial included cases filed no later than 1981.

[6]These factors show the importance of compliance with Rule 134, dealing with continuances, which states in part:

"A motion for continuance, filed 30 days or less prior to the date to which it is directed, may be set for hearing on that date, but ordinarily will be deemed dilatory and will be denied unless the ground therefor arose during that period or there was good reason for not making the motion sooner."

of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. *Helvering v. Mitchell*, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968); *Webb v. Commissioner*, 394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Gajewski v. Commissioner*, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. *Beaver v. Commissioner*, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Stone v. Commissioner*, 56 T.C. 213, 223–224 (1971); *Otsuki v. Commissioner*, 53 T.C. 96, 105–106 (1969).

By reason of his conviction under section 7201 for the year 1973, petitioner is collaterally estopped from denying fraud for that year. *Amos v. Commissioner*, 43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965); *Arctic Ice Cream Co. v. Commissioner*, 43 T.C. 68 (1964). Respondent, however, must prove fraud in each of the other years involved. *Drieborg v. Commissioner*, 225 F.2d 216, 220 (6th Cir. 1955). A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years. *Holland v. United States*, 348 U.S. 121, 129 (1954); *Lollis v. Commissioner*, 595 F.2d 1189, 1191 (9th Cir. 1979); *Furnish v. Commissioner*, 262 F.2d 727 (9th Cir. 1958); *Baumgardner v. Commissioner*, 251 F.2d 311 (9th Cir. 1957); *Otsuki v. Commissioner, supra.*

In this case, of course, the evidence of unreported income consists of respondent's net-worth analysis. The validity of that analysis must be examined by applying the standards set forth in *Holland v. United States, supra.* Under *Holland*, the

Government must establish, with reasonable certainty, an opening net worth; and either must have conducted a reasonable investigation of leads negating possible sources of nontaxable income; or must have established a likely source of unreported taxable income. To some extent, these requirements are interdependent. For example, the reasonableness of the opening net worth may depend upon the negation of a higher net worth by the investigation of leads. The investigation of leads involving nontaxable sources of income may strengthen the inference that net-worth increases are attributable to an identified taxable source.

In this case, as in *Holland* and many others, petitioner has challenged the opening net worth by claiming that he had a substantial cash hoard prior to the opening date, January 1, 1967. He has given, however, inadequate and inconsistent explanations of the source of the alleged cash hoard. He stated to respondent's agent that cash accumulated prior to 1967 as a result of savings and a lucky find was deposited in bank accounts from time to time. The purported witnesses to the alleged cash hoard maintained by petitioner, with the exception of his former wife, claim knowledge based solely on statements by petitioner and attribute the cash hoard to withdrawals from bank accounts during a period of marital difficulties. Petitioner declined to identify for respondent's agents the alleged witness to his lucky find, and he has not to this date identified any such witness.

Respondent's agents examined petitioner's bank accounts but found few deposits of cash. They determined that almost all of the checks deposited to petitioner's accounts could be identified as business receipts. They interviewed petitioner's mother and father and negated (1) personal knowledge by either of those witnesses of the alleged cash hoard, and (2) any substantial nontaxable receipts, such as gifts and insurance proceeds. In any event, petitioner refused to disclose to respondent's agents, and has not advised the Court, the amount of cash he claims to have accumulated prior to 1967. Having reasonably investigated the leads provided by petitioner, respondent was justified in using the sum of $1,000, a figure once given by petitioner as the beginning net worth, and in disregarding unconfirmed claims of nontaxable receipts.

Petitioner has expressly admitted two sources of taxable income, the moving business and the sale of emeralds. He protests, generally, that the moving business could not have produced the additional income determined by respondent, and he complains that no credit has been given for the cost of the emeralds. He has not presented any persuasive evidence, however, to support either claim. Meanwhile, by failing to respond to requests for admissions, he has admitted the substantial acquisition transactions included in respondent's net-worth analysis. Matters deemed admitted under Tax Court Rules may be considered as evidence of fraud. See *Doncaster v. Commissioner*, 77 T.C. 334 (1981); *Gilday v. Commissioner*, 62 T.C. 260 (1974). Even without the admissions, petitioner has not disputed the occurrence transactions. We therefore conclude that the net-worth and expenditures analysis used by respondent in this case establishes a consistent pattern of underreporting of substantial amounts of income. The pattern of acquisition of substantial assets while reporting nominal gains or business losses on his returns convinces us that petitioner knew that he had substantially understated his income and substantially underpaid his tax.

The intent to conceal or mislead may also be inferred from other evidence of petitioner's conduct. See *Spies v. United States*, 317 U.S. 492, 499 (1943). Petitioner has never explained the deception practiced on the agents when they first attempted to interview him, or his inconsistent statements. Notwithstanding respondent's burden of proof as to fraud, there comes a time when petitioner must come forward with evidence in support of his claimed defenses; it is not enough merely to raise theoretical defenses in an attempt to create a reasonable doubt as to respondent's evidence. Compare *Elwert v. United States*, 231 F.2d 928, 933-936 (9th Cir. 1956); *United States v. Shavin*, 320 F.2d 308, 310-311 (7th Cir. 1963). Petitioner's failure, over the years this case was pending, prior to trial and to date, to explain the incriminating evidence by coming forward with other evidence in support of his contentions justifies the inference that such evidence does not exist or would be unfavorable to him. See *United States, For C. H. Benton, Inc. v. Roelof Const. Co.*, 418 F.2d 1328 (9th Cir. 1969); *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946). Review of the entire record in this case convinces

us that the additions to tax for fraud should be sustained as to each year.

*Decision will be entered for the respondent.*