BENJAMIN W. DAJOS, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dajos v. Commissioner
Docket No. 35713-84.
United States Tax Court
T.C. Memo 1986-330; 1986 Tax Ct. Memo LEXIS 279; 51 T.C.M. (CCH) 1648; T.C.M. (RIA) 86330; July 30, 1986. Jeffrey B. Levine, for the petitioner. Pamela R. Martin, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: In his notice of deficiency, respondent determined additions to tax in petitioner's 1969 through 1974 Federal income tax *280 liabilities, as follows: Addition to Tax, I.R.C. 1954
Year
Section 6653(b) [1]
1969
$5,992.72
1970
25,279.50
1971
7,324.15
1972
7,889.15
1973
20,196.86
1974
33,065.22
The sole issue for decision is whether any part of petitioner's underpayment of tax for the years 1969 through 1974 is due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference. At the time of filing the petition in this case, petitioner resided in Coldwater, Mich.
Petitioner is an attorney who received his law degree from the University of Michigan in 1955 and is admitted to practice law in the State of Michigan. During the years 1969 through 1974, petitioner was a self-employed attorney in Coldwater, Mich. Petitioner established his practice in 1957. His practice was a general practice including criminal, personal injury, divorce and other matters. Petitioner handled no tax cases, nor did he engage in tax return preparation for *281 any of his clients. His only connection with tax matters was in divorce cases, where he would advise his clients to stipulate which parent would be entitled to dependency exemptions for the children. Petitioner began his law practice as a sole practitioner. However, during the tax years at issue his practice had grown and he employed other attorneys. From the time he opened his law practice, and throughout the years at issue, petitioner employed no bookkeeper or accountant. Petitioner devised and established the bookkeeping and accounting system for his office. Petitioner had no formal training in accounting matters. The bookkeeping system petitioner set up worked as follows: When a client retained petitioner on a matter, and paid a fee, petitioner or his secretary would prepare a receipt for the amount. A carbon copy of the receipt would remain on a "receipt sheet" or "board." Approximately 30 receipts would fill such a sheet, at which point petitioner or his secretary would deposit the money in a "trust" or "escrow" account (petitioner's terminology) maintained by petitioner at the Branch County Bank ("Branch County account"). This bank was one of two banks in existence *282 in Coldwater, Mich., when petitioner's practice began in 1957. Expenses incurred in connection with a client matter would be paid out of this account. A separate ledger sheet was set up for each of petitioner's cases. The fee received for handling a case would be recorded on the ledger sheet. Any expenses paid out of the Branch County account in relation to a case would also be noted on the appropriate ledger sheet. The ledger sheet for each case also contained other notations for meetings, trial dates, etc. A second bank account was maintained by petitioner at the Southern Michigan National Bank, the other bank in Coldwater ("Southern Michigan account"). This account was used to pay petitioner's operating expenses, such as telephone, rent and supplies. Whenever the Southern Michigan account was overdrawn, or petitioner became aware he needed additional funds in that account to meet operating expenses, he would transfer money from the Branch County account into the Southern Michigan account. Petitioner or his secretary would first look through the ledger cards maintained for each case. If the work on a case had been completed, the case could be closed. The expenses charged *283 to that case, which had been recorded on the card, would be subtracted from the fees received. Any excess would be considered by petitioner to be income to the practice, and could then be transferred over to the Southern Michigan account to use in paying the firm's expenses. Usually, 20 or 30 cases would be closed, and the applicable amounts transferred, at a given time. Petitioner had sole signatory authority over the two bank accounts. As the practice was run as a sole proprietorship, the name on the accounts was petitioner's alone. Petitioner rarely handled the actual banking or bookkeeping, however. His secretary almost always took care of the receipt of fees and payment of expenses, and maintained the books and records of the practice. She would endorse checks and transfer funds on his behalf, using his stamp. From time to time, when the funds in the Branch County account exceeded the limits protected by Federal insurance, petitioner would withdraw the excess funds and use them to purchase certificates of deposit. Petitioner would make personal use of the interest earned on the certificates. When a certificate matured, petitioner or his secretary would prepare a new *284 receipt for the amount of principal and redeposit the funds into the Branch County account. Other than the interest on the certificates of deposit, petitioner did not pay himself any salary or take a regular draw during the years at issue. Petitioner did not maintain an extravagant or high standard of living. His personal living expenses were minimal. He was single and, at least in the early years, lived with his parents while he worked to establish his practice. He rarely bought clothes, ate in restaurants, or took vacations, except for attending the annual American Bar Association convention. Petitioner did own a car and spent money for related expenses, such as gasoline and insurance. Petitioner was a hard-working, conscientious attorney. At all times he attempted to segregate what he considered to be his clients' funds, in the Branch County account, from those used to run his law office, in the Southern Michigan account. He set up his bookkeeping system, without professional advice, with the intent of accurately recording his firm's fees and expenses. Once his bookkeeping system was established, petitioner and his employees, which after a while included other attorneys, *285 followed it consistently. The system was established in 1957 and was used during the years at issue. As a result of petitioner's home-made accounting methods, petitioner concluded at the end of each year that his practice had no taxable income. All income from a client's case, once closed, would be transferred into the Southern Michigan account, where it would be used to pay operating expenses. Since the balance in that account was always being depleted, requiring new transfers of money from the Branch County account, petitioner would arrive at the erroneous conclusion that the firm had no net income. Petitioner therefore did not file any income tax returns from 1957 through 1974. On April 9, 1979, petitioner was charged by information with three counts of willful failure to file an income tax return for the years 1972, 1973 and 1974, in violation of 26 U.S.C. section 7203. Petitioner pled guilty to count two of the information, the charge relating to 1973, on June 13, 1979. During the Internal Revenue Service investigation of petitioner's failure to file, petitioner cooperated fully with the investigating agents. Petitioner answered all questions, and *286 provided the agents with all requested books and records, cancelled checks, and bank statements. [2] He permitted the agents to examine the records on the premises as well as to remove them from the premises. On several occasions petitioner reiterated that he thought his accounting system was right, and asked them to correct him if it was wrong. His records were complete enough for respondent to easily and accurately determine taxable income. *287 Petitioner earned gross receipts in years 1969 through 1974 as follows: Year
Gross Receipts
1969
$58,892.96
1970
118,464.88
1971
71,826.79
1972
86,134.46
1973
129,636.37
1974
162,084.96
Petitioner earned interest income in 1969 through 1974 as follows: Year
Interest Income
1969
$1,124.98
1970
2,525.89
1971
5,038.73
1972
8,137.50
1973
10,934.20
1974
16,133.06
During the years 1969 through 1974, petitioner had taxable income as follows: Year
Taxable Income
1969
$28,597.00
1970
90,306.00
1971
39,518.00
1972
41,580.00
1973
86,815.00
1974
114,695.00
Petitioner was liable for underpayments in income tax resulting from the receipt of undeclared taxable income for the years 1969 through 1974, as follows: Year
Underpayment in Income Tax
1969
$11,985.45
1970
50,559.00
1971
14,648.29
1972
15,778.31
1973
40,393.72
1974
66,130.00
Petitioner has paid in full all taxes and interest owing for the years 1969 through 1974. OPINION Section 6653(b) provides for an addition to tax equal to 50 percent of the underpayment of tax, if any part of the *288 underpayment is due to fraud. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); [3]Zack v. Commissioner,692 F.2d 28 (6th Cir. 1982), cert. denied 460 U.S. 1084 (1983), affg. a Memorandum Opinion of this Court. Respondent must establish that there was an underpayment of tax, and that part of that underpayment was due to the taxpayer's fraud. Hebrank v. Commissioner,81 T.C. 640 (1983). For purposes of this section, fraud is an actual, intentional wrongdoing. Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941). The intent required is the specific purpose to evade a tax believed to be owing. Stoltzfus v. United States,398 F.2d 1002 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Professional Services v. Commissioner,79 T.C. 888 (1982). Whether fraud exists is a question of fact to be determined from the entire record. Rowlee v. Commissioner,80 T.C. 1111 (1983); Gajewski v. Commissioner,67 T.C. 181 (1976), *289 affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85 (1970). Circumstantial evidence is permitted where direct evidence of fraud is not available, and fraud may be properly inferred where a taxpayer's entire course of conduct establishes the necessary intent. Stephenson v. Commissioner,79 T.C. 995 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984); Rowlee v. Commissioner,supra;Stone v. Commissioner,56 T.C. 213 (1971).Fraud may not, however, be inferred from a mere understatement of income, Holland v. United States,348 U.S. 121 (1954), or from a deficiency in taxes due to an honest mistake or poor judgment. Iley v. Commissioner,19 T.C. 631 (1952). In the circumstances of this case, we conclude that respondent has not met his burden of establishing fraud by clear and convincing evidence. Although it is undisputed that petitioner failed *290 to file income tax returns during the years at issue, the mere failure to file a return, standing alone, is not sufficient to establish fraud. Kotmair v. Commissioner, 86 T.C.     (June 19, 1986). There must also be some other proof of fraudulent intent to evade tax, through other indicia or "badges" of fraud. Solomon v. Commissioner,732 F.2d 1459 (6th Cir. 1984), affg. a Memorandum Opinion of this Court. No other indicia of fraud are present in this case. Certainly, no direct evidence of fraud has been adduced. There is no evidence of any falsification or alteration of books and records. Petitioner and his office staff consistently maintained and preserved careful records. There is also no evidence of concealment or attempts to mislead respondent's agents. Petitioner was cooperative and forthright throughout respondent's investigation and the trial of this case, answering questions directly and candidly and supplying all requested books and records. At trial, he impressed us as a sincere (though mistaken) individual, and did not appear to be evasive or deceptive in any way. Petitioner's actions and statements do not demonstrate an intent to evade *291 a tax he believed to be owing. Nor do we find any circumstantial evidence, gleaned from petitioner's entire course of conduct, which compels the conclusion that petitioner fraudulently intended to evade taxes. Respondent bases his arguments in support of a finding of fraud mainly on the fact that petitioner was an attorney whose practice earned substantial gross receipts during the years at issue and who personally devised and supervised the accounting system maintained in his office. [4] While such facts are not disputed, we do not find them, standing alone, sufficient to establish fraudulent intent in this case. *292 We have not overlooked the fact that petitioner is an attorney. In determining the presence or absence of fraud, we "must consider the native equipment and the training and experience of the party charged." Iley v. Commissioner,19 T.C. at 635. However, even in cases involving attorneys with knowledge of tax law, or Certified Public Accountants, this Court has always required some indicia of fraud other than the mere failure to file returns in order to support a finding of fraud. For instance, in Rinehart v. Commissioner,T.C. Memo. 1983-184, we held that respondent had not met its burden of proving fraud although the taxpayer, who had omitted income, overstated deductions, and previously pled guilty to the crime of willfully filing a false return under section 7206(1), was an experienced attorney with a great familiarity with tax law. In Solomon v. Commissioner,T.C. Memo. 1982-603, affd. per curiam 732 F.2d 1459 (6th Cir. 1984), the taxpayer was a Certified Public Accountant who failed to file for several years in which he earned substantial amounts of income, including embezzlement income. While we held that *293 he was liable for the addition to tax for fraud, we applied the same standard as in any other fraud case, and based our holding not on the taxpayer's education alone, but also on proof of concealment, destruction of records, and other badges of fraud. In Beaver v. Commissioner,supra, the taxpayer was a C.P.A. who did not file a return for seven years, until after the Internal Revenue Service discovered his delinquency. Our finding that he had fraudulently intended to evade tax was based on evidence of concealment and attempts to mislead respondent's agents, and not on the taxpayer's knowledge of tax law alone.We likewise found fraud in Estate of Ming v. Commissioner,T.C. Memo. 1976-115, a similar case involving an attorney with knowledge of tax law who had failed to file returns and attempted to deceive the Internal Revenue Service representative investigating the matter. Finally, in Koeneman v. Commissioner,T.C. Memo. 1958-186, we held that an attorney with experience in tax law was liable only for the addition to tax for failure to file returns, and not for fraud, where he had failed to file for several years but had *294 fully cooperated during his investigation and had not attempted to falsify records, mislead the government or conceal income. In that case we stated that "[t]o sustain [the Commissioner] on the record with respect to this issue, would require us to hold that the bare failure of an attorney possessing some knowledge of the requirements of Federal tax law to file returns, amounts to fraud with intent to evade tax on the part of such an attorney. This we are unwilling to do." Koeneman v. Commissioner,supra (17 T.C.M. 936, 939, 27 P-H Memo T.C. par. 58,186 at 810-58). We admit that it is difficult to imagine how a licensed attorney, with nearly 20 years of experience, a graduate of a recognized law school, could have so misconstrued his financial situation or so neglected his legal obligations. After examining the record, however, we conclude that petitioner lacked the specific intent to evade tax which is required to find fraud. We agree with respondent insofar as he argues that given petitioner's education and professional background, petitioner should have better understood his obligation to file returns and pay tax. If the additions to tax at issue *295 herein were pursuant to section 6651(a), failure to file, or section 6653(a), negligence, we would have reached a different result. Petitioner's failure to file was clearly willful and his underpayment of tax negligent within the meaning of those sections. [5] In particular, we note that petitioner's personal use of the interest earned on the certificates of deposit must have, or at least should have, indicated to him that he had taxable income other than money which was constantly being funneled back into the practice. Even assuming that petitioner knew, from the interest income, that he should have filed a return but failed to do so, we do not find fraud as defined by the authorities cited herein. The evidence in this case nowhere reaches the level of proving a specific purpose to evade tax. At most, what has been proved is a negligent, misguided method of accounting and a willful failure to file as a result of such method. *296 We note that respondent chose not to assert, in the alternative, the additions to tax for negligence or failure to file, but rested his case entirely on proving fraud. On brief, however, respondent invited the Court to assert have above additions to tax as alternatives on our own initiative, in the event that we do not find fraud. We decline to do so. Again, had respondent himself asserted these additions to tax in his notice of deficiency, in an answer, or in a motion to conform the pleading to the proof at close of trial, we would have considered the issue and sustained his determination in this regard. However, it is too late on brief to raise a new issue which petitioner had no chance to argue. As respondent's entire case was therefore based on the issue of fraud, and we have found for petitioner on this issue, Decision will be entered for petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
2. The extent of petitioner's cooperation with respondent's investigation is illustrated by this excerpt from petitioner's testimony at trial: * * * they wanted to see our cancelled checks, and we showed them the cancelled checks from the Branch County Bank. We showed them all of our cancelled [checks] from the Southern Michigan Bank. We showed them our checkbook. All of our checkstubs. We showed them all of our receipt sheets. And anything they asked for we gave to them. And there was a time when obviously it would take time to look through these things, and particularly when Mr. Blackburn [the special agent] was there, they would go to our library and they could use, you know, I made the library available to them. They could look at records all they wanted to. We took them coffee.I mean I did everything I could to try to accomodate them because I had the impression that they were just sort of checking up to see whether my system was correct or not. [Transcript pp. 18-19.]↩
3. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Respondent also urges us to consider petitioner's long history of failing to file returns and failure to report substantial amounts of income as evidence of fraud. Clearly, such a pattern may be considered in determining whether fraud exists. See, e.g., Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); Kurnick v. Commissioner,232 F.2d 678 (6th Cir. 1956), affg. a Memorandum Opinion of this Court. We do not, however, believe it to be conclusive evidence. In Powell v. Granquist,supra,↩ the taxpayer did not cooperate completely with the investigating agents. This factor and others led to the court's finding of fraudulent intent -- factors not present here. Moreover, in the instant case, petitioner's history of nonfiling is consistent with his testimony that his method of bookkeeping led him to believe he had no taxable income, year after year. Petitioner's consistent pattern of failure to file does not, therefore, convince us that such failure was due to fraud.
5. Moreover, petitioner would be collaterally estopped from denying that his failure to file in 1973 was both willful and due to negligence based on his criminal conviction under sec. 7203 as to that year. See Kotmair v. Commissioner, 86 T.C.     (June 19, 1986); Castillo v. Commissioner,84 T.C. 405 (1985). The fact that petitioner's conviction was based on a guilty plea has no bearing on the collateral estoppel effect of that conviction. Arctic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964). The sec. 7203 conviction does not collaterally estop petitioner from denying that his underpayment for 1973 was due to fraud, however. Miller v. Commissioner,↩ 1986-280.