T.C. Memo. 2004-90


UNITED STATES TAX COURT


VIRGINIA FERGUSON, f.k.a. VIRGINIA DEL BOSQUE, AND ESTATE OF
ARMAND J. DEL BOSQUE, DECEASED, LORI DEL BOSQUE, SPECIAL
ADMINISTRATOR, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 3275-01, 3276-01,     Filed March 29, 2004.
            3277-01.

Peter L. Milinkovich, for petitioners.

David L. Zoss, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, Judge:  Respondent determined deficiencies in

petitioners' Federal income tax, additions to tax, and a penalty

_____

[1]Cases of the following petitioners are consolidated
herewith:  Estate of Armand J. Del Bosque, Deceased, Lori Del
Bosque, Special Administrator, docket No. 3276-01; Bradley T.
Jacobsen and Donna M. Cleare-Jacobsen, docket No. 3277-01.

for 1987, 1988, and 1989 as follows:[2]

Docket No. 3275-01

|  |  | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1)(A) | 6653(b)(1)(B) | 6653(b) |
| 1987 | $20,861 | $15,646 | 50% of the interest due on $20,861 | -- |
| 1988 | 3,213 | -- | -- | $2,410 |

Docket No. 3276-01

|  |  | Penalty |
| Year | Deficiency | Sec. 6663 |
| 1989 | $10,494 | $7,871 |

Docket No. 3277-01

|  |  | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1)(A) | 6653(b)(1)(B) | 6653(b) |
| 1987 | $12,005 | $9,004 | 50% of the interest due on $12,005 | -- |
| 1988 | 9,985 | -- | -- | $7,489 |

The issues remaining to be decided are:[3]

1. Whether decedent, Armand J. Del Bosque (Mr. Del Bosque), had unreported gross receipts for 1987, 1988, and 1989 in the respective amounts of $67,163, $16,557, and $32,779, computed under the net worth method.

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

[3]The parties have stipulated that (1) Bradley T. Jacobsen (Mr. Jacobsen) and Donna M. Cleare-Jacobsen (Mrs. Jacobsen) are entitled to deduct in 1987 the $2,000 contribution to an IRA that respondent disallowed, (2) Virginia Ferguson is entitled to relief under sec. 6015(c) with respect to the deficiencies and additions to tax for 1987 and 1988, and (3) Mrs. Jacobsen is entitled to relief under sec. 6015(b) with respect to the deficiencies and additions to tax for 1987 and 1988.

2.   Whether Bradley T. Jacobsen (Mr. Jacobsen) had unreported gross receipts of $28,378 in 1987 and $29,747 in 1988, computed under the net worth method.

3.   Whether Mr. Jacobsen had additional unreported income of $6,285 in 1987 and $6,309 in 1988, on the basis of Bureau of Labor Statistics figures.

4.   Whether Mr. Del Bosque is liable for additions to tax and/or a civil fraud penalty for 1988 and 1989.[4]

5.   Whether Mr. Jacobsen is liable for an addition to tax for fraud for 1988.[5]

6.   Whether the period of limitations on assessment and collection with respect to 1988 and 1989 expired before respondent issued the subject notices of deficiency to petitioners.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Mr. Del Bosque died on April 5, 2003, after the conclusion of the trial in these cases.  When the petitions in these cases were filed, Mr. Del Bosque resided in Roseville, Minnesota,

---

[4]Mr. Del Bosque's estate concedes that he is liable for the addition to tax for fraud for 1987.

[5]Mr. Jacobsen concedes that he is liable for the addition to tax for fraud for 1987.

Virginia Ferguson (Ms. Ferguson) resided in Fridley, Minnesota, and Mr. Jacobsen and Donna M. Cleare-Jacobsen (Mrs. Jacobsen) resided in Apple Valley, Minnesota. Hereinafter, references to petitioners are to Messrs. Del Bosque and Jacobsen.

On December 31, 1986, petitioners each owned two snowmobiles--a 1987 Polaris Indy 600 and a 1987 Polaris Indy Sport. Petitioners each purchased the 1987 Polaris Indy 600s from Metro-North Sports on October 15, 1986, for the base price of $4,688; two items identified as "north country" were purchased at the same time for $469 each. The record does not disclose when the 1987 Polaris Indy Sports were purchased; however, a receipt from Metro-North Sports shows that, on October 29, 1986, petitioners purchased accessories and parts for two "Indy 600s" and two "Sports". Mr. Jacobsen disposed of his Sport in 1988.

In December 1986, Mrs. Jacobsen made a $2,000 loan to her employer. This loan was repaid in 1987.

Mrs. Jacobsen had a Chase Manhattan "money market with checks" account (the MMWC account). On December 31, 1986, the balance in that account was $8,618.

In 1986, Mrs. Jacobsen received an inheritance of $12,518 plus a one-eighth interest in a contract for deed valued at $1,966.

On December 31, 1986, Mr. Del Bosque had $12,000 in an account with First Bank East. In January 1987, he used funds

from that account to open a brokerage account. On January 16, 1987, Mr. Del Bosque purchased 234 shares of Fidelity Growth Fund for $3,320. On April 22, 1987, he sold those shares for $3,756 and purchased 1 share for $16. Mr. Del Bosque reported the $436 gain from the sale of the 234 shares on his 1987 return. On January 22, 1988, he sold the remaining share for $13. On his 1988 return, he erroneously reported a basis of $3,320 in the 1 share and a $3,307 long-term capital loss on the sale of the share.

At the end of 1987, Mr. Del Bosque owed $3,921 to Larson Quinn Motor Co. He repaid the loan in 1988.

During the years at issue, petitioners purchased leather goods (mostly leather jackets) for resale. In both 1987 and 1988, Mr. Jacobsen purchased $3,770 of leather goods for resale. Mr. Del Bosque purchased $13,298 of leather goods for resale in 1987, $3,862 for resale in 1988, and $2,375 for resale in 1989. Petitioners did not keep any records of their sales of leather goods.

During the years at issue, petitioners each owned 50 percent of the stock of Top Play, Inc. (Top Play), an S corporation doing business as Twin Star Limousine Service.

In 1987, 1988, and 1989, petitioners were employed by, and received wages from, Top Play.[6]  Also during those years, Mr. Jacobsen was employed by, and received wages from, Chinook, Inc. (Chinook), doing business as Five Corners Saloon.

In 1987, Top Play purchased a mobile telephone system for $1,797.  This purchase was charged to Mr. Jacobsen's credit card.  Top Play paid the credit card company $1,300 in 1987 and $763 in 1988 for the purchase of the mobile telephone system.

Some of the limousine runs generated cash for which no run sheets were prepared, and petitioners often paid drivers in cash.  Petitioners did not maintain accurate records of Top Play's cash receipts and cash payroll.  They did not inform Top Play's accountant of the cash receipts and payroll items.  As a result, Top Play's 1987 and 1988 income tax returns and financial statements did not reflect those items.

In February of 1990, petitioners sold the assets of the limousine service to Susan Pavlak for approximately $350,000.  After a few months, Ms. Pavlak compared Top Play's operating performance in 1989 to its performance in 1990, as indicated in the financial records she had reviewed before purchasing the limousine business.  She concluded that the limousine business was producing less revenue.

---

[6]In 1988, Ms. Ferguson was employed by, and received wages from, Gantos, Inc.  In 1987, Mrs. Jacobsen was employed by, and received wages from, Gray Display and Chinook, Inc.

Ms. Pavlak believed that petitioners had misrepresented the profitability of the limousine business on the Top Play income tax returns that she had reviewed and relied upon in purchasing Top Play. On July 8, 1990, she met with petitioners and proposed that they repurchase Top Play for $340,000. Petitioners did not respond to her proposal. Thereafter, Ms. Pavlak sued petitioners for fraud and misrepresentation with respect to her purchase of Top Play. She received a judgment in the amount of $95,000.

Because Ms. Pavlak believed that a portion of Top Play's cash receipts in 1989 had likely been derived from illegal activities, she contacted the U.S. Drug Enforcement Administration (DEA). The DEA referred Ms. Pavlak to the Criminal Investigation Division of the Internal Revenue Service (IRS).

In July of 1990, Tom Fisher, an IRS special agent assigned to the Federal narcotics task force, began investigating petitioners' business activities. Agent Fisher determined that petitioners had unreported income. He believed that narcotics and/or gambling activities were the possible sources for this income.

Agent Fisher reconstructed petitioners' incomes using the net worth method. Agent Fisher chose the net worth method to compute petitioners' incomes because (1) excessive cash had been

deposited into Top Play's accounts, (2) petitioners used cash for personal expenditures, and (3) there were no specific items of unreported income.

To compute petitioners' incomes, Agent Fisher identified petitioners' assets, liabilities, and expenses. Agent Fisher used information obtained from third parties, searches of petitioners' residences, and Top Play's records. For some items, Agent Fisher used financial statements prepared by petitioners in 1986 and 1987. Agent Fisher determined petitioners' net worths as of December 31, 1986 through 1989. (Reference to petitioners' 1986, 1987, 1988, and 1989 net worths are to their respective net worths on December 31 of the referenced year.) Agent Fisher reconstructed petitioners' incomes by comparing changes in their net worths from one year to the next for the years in issue.

In February 1993, Mr. Del Bosque was arrested for purchasing anabolic steroids.[7] On March 3, 1993, a four-count indictment was filed in the U.S. District Court for the District of Minnesota, charging Mr. Del Bosque with conspiring to import, and to possess with the intent to distribute, controlled substances (anabolic steroids), and with aiding and abetting the importing, and possessing with the intent to distribute, controlled substances (anabolic steroids).

---

[7]Mr. Del Bosque competed in body building competitions and had held two Mr. Minnesota titles. To that end he used anabolic steroids.

In April 1993, Mr. Del Bosque became ill and was diagnosed with cardiomyopathy.  He was hospitalized in a coronary intensive care unit for 9 days.

On June 23, 1993, a five-count criminal information was filed in the U.S. District Court for the District of Minnesota (the criminal tax proceeding) naming petitioners codefendants. Counts I, II, and III charged Mr. Del Bosque with tax evasion for 1987, 1988, and 1989 in violation of section 7201.  Counts IV and V charged Mr. Jacobsen with tax evasion for 1987 and 1988 in violation of section 7201.

Petitioners entered into plea agreements by which they agreed to plead guilty to tax evasion in 1987 as set forth in counts I and IV, and the Government agreed to move for dismissal of counts II, III, and V.  Mr. Del Bosque also entered into a plea agreement in his drug case in which he agreed to plead guilty to conspiring to import anabolic steroids.

In the criminal tax proceeding, Mr. Del Bosque acknowledged that his steroid arrest and his illness were contributing factors in his decision to plead guilty to the tax evasion charge and that his medical condition was such that he could not withstand a trial.

Mr. Del Bosque's plea agreement set forth the factual basis upon which the agreement was reached.  The agreement stated that (1) from January 1, 1987, through December 31, 1989, Mr. Del

Bosque worked with Mr. Jacobsen to hide income and evade taxes, (2) in furtherance of his scheme with Mr. Jacobsen, Mr. Del Bosque filed false tax returns for 1987, 1988, and 1989, (3) Mr. Del Bosque omitted substantial income from those returns with the intent to evade taxes, (4) the Government contended that Mr. Del Bosque understated his income for 1987 through 1989 by $116,499, and (5) Mr. Del Bosque accepted the Government's calculation of the omitted income.

For purposes of the sentencing guidelines, Mr. Del Bosque stipulated that (1) he understated his taxable income in 1987, 1988, and 1989 by $116,499, (2) the corresponding tax loss (calculated at 28 percent) was approximately $32,734, and (3) he "employed the same course of conduct and a common plan with respect to the evasion of taxes in tax years 1987, 1988, and 1989, with the relevant conduct * * * consisting of the total tax loss for all three years even though the offense of conviction is for tax year 1987."

Mr. Jacobsen's plea agreement set forth the factual basis upon which that agreement was reached. The agreement stated that (1) from January 1, 1987, through December 31, 1988, Mr. Jacobsen worked with Mr. Del Bosque to hide income and evade taxes, (2) in furtherance of his scheme with Mr. Del Bosque, Mr. Jacobsen filed false tax returns for 1987 and 1988, (3) Mr. Jacobsen omitted substantial income from his 1987 and 1988 returns with the intent

to evade taxes, (4) the Government contended that Mr. Jacobsen understated his income for 1987 and 1988 by $58,125, and (5) Mr. Jacobsen accepted the Government's calculation of the omitted income.

For purposes of the sentencing guidelines, Mr. Jacobsen stipulated that (1) he understated his taxable income in 1987 and 1988 by $58,125, (2) the corresponding tax loss (calculated at 28 percent) was approximately $16,275, and (3) he "employed the same course of conduct and a common plan with respect to the evasion of taxes in tax years 1987 and 1988, with the relevant conduct * * * consisting of the total tax loss in both years even though the offense of conviction is for tax year 1987."

In their plea agreements, petitioners acknowledged that the IRS was not a party to the agreements and that when determining their civil tax liabilities, the IRS was not bound by the stated amounts of omitted income in the criminal tax proceeding.

On December 17, 1993, petitioners were convicted of tax evasion under section 7201 for 1987. They each were sentenced to 6 months' imprisonment, 2 years' supervised release, and a $50 special assessment for the Crime Victims' Fund. As a condition of the supervised release, petitioners were required to cooperate with the IRS with regard to civil tax penalties.

Also on December 17, 1993, Mr. Del Bosque was convicted of conspiring to import a substance containing anabolic steroids.

He was sentenced to 3 months' imprisonment to be served concurrently with his sentence for tax evasion, 2 years' supervised release, and a $50 special assessment for the Crime Victims' Fund.

On December 12, 2000, respondent issued a notice of deficiency to Mr. Del Bosque and Ms. Ferguson for 1987 and 1988 and another notice of deficiency to Mr. Del Bosque for 1989. In those notices of deficiency, respondent determined that Mr. Del Bosque received, but failed to report, gross receipts of $67,163 in 1987, $16,557 in 1988, and $32,779 in 1989, computed as follows:

|  | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|
| Net worth computation: | | | | |
| Assets | $143,230 | $208,392 | $235,941 | $292,189 |
| Liabilities | 71,995 | 125,564 | 139,430 | 142,708 |
| Net worth | 71,235 | 82,828 | 96,511 | 149,481 |
| Less prior year's net worth | | 71,235 | 82,828 | 96,511 |
| Increase in net worth | | 11,593 | 13,683 | 52,970 |
| Adjustments: | | | | |
| Additions: | | | | |
| Nondeductible expenses | | 75,826 | 86,751 | 77,356 |
| Itemized deductions expenditures | | 12,840 | 22,007 | 23,254 |
| Subtractions: | | | | |
| Nonincome items | | (2,546) | (67,090) | (63,912) |
| Adjusted gross income | | 97,713 | 55,351 | 89,668 |
| Itemized deductions | | (12,118) | (15,627) | (16,545) |
| Personal exemptions | | (3,800) | (3,900) | (2,000) |
| Corrected taxable income | | 81,795 | 35,824 | 71,123 |
| Taxable income reported | | (14,632) | (19,267) | (38,344) |
| Gross receipts | | 67,163 | 16,557 | 32,779 |

The gross receipts adjustments are the same as, and are directly based upon, the net worth computations used in Mr. Del Bosque's criminal tax proceeding.

On December 12, 2000, respondent issued a notice of deficiency to Mr. and Mrs. Jacobsen for 1987 and 1988. In that notice of deficiency, respondent determined that Mr. Jacobsen received, but failed to report, gross receipts of $28,378 in 1987 and $29,747 in 1988, computed as follows:

|  | 1986 | 1987 | 1988 |
| --- | --- | --- | --- |
| Net worth computation: |  |  |  |
| Assets | $330,569 | $356,098 | $441,985 |
| Liabilities | 144,741 | 152,332 | 159,418 |
| Net worth | 185,828 | 203,766 | 282,567 |
| Less prior year's net worth |  | 185,828 | 203,766 |
| Increase in net worth |  | 17,938 | 78,801 |
| Adjustments: |  |  |  |
| Additions: |  |  |  |
| Nondeductible expenses |  | 46,965 | 45,866 |
| Itemized deductions expenditures |  | 15,295 | 18,967 |
| Subtractions: |  |  |  |
| Nonincome items |  | (2,051) | (59,504) |
| Adjusted gross income |  | 78,147 | 84,130 |
| Itemized deductions |  | (13,130) | (14,857) |
| Personal exemptions |  | (3,800) | (3,900) |
| Corrected taxable income |  | 61,217 | 65,373 |
| Taxable income reported |  | (32,839) | (35,626) |
| Gross receipts |  | 28,378 | 29,747 |

The gross receipts adjustments are the same as, and are directly based upon, the net worth computations used in Mr. Jacobsen's criminal tax proceeding.

Respondent also increased the Jacobsens' income by $6,285 in 1987 and $6,309 in 1988 using Bureau of Labor Statistics figures.

These additional amounts were computed on the basis of 1991 Bureau of Labor Statistics figures, discounted by 10 percent for 1987 and by 7.5 percent for 1988. The figures each year included $266 for cigarettes and $1,640 for auto repairs.

Mr. Jacobsen does not smoke cigarettes. Mr. Jacobsen purchased a new car each year in issue. Since his cars were always under warranty, Mr. Jacobsen incurred nominal expenses for auto repairs.

OPINION

## I. Issues 1, 2, and 3--Unreported Income

### A. The Net Worth Method

A taxpayer is required to maintain records sufficient to enable the Commissioner to determine his tax liabilities. Sec. 1.6001-1(a), Income Tax Regs. When a taxpayer keeps no books, or keeps books that are inadequate or demonstrably inaccurate, section 446(b) authorizes the Commissioner to compute the taxpayer's income by any method that clearly reflects his income. In such cases, the Commissioner may compute a taxpayer's income and income tax liability by a variety of indirect methods, including the net worth method, as used by respondent in this case. Holland v. United States, 348 U.S. 121 (1954).

If the Commissioner's determination of tax liability is calculated according to an acceptable procedure, such as the net worth method, the taxpayer has the burden of producing evidence

to the contrary.  Helvering v. Taylor, 293 U.S. 507 (1935); Simon v. Commissioner, 248 F.2d 869, 874 (8th Cir. 1957), affg. U.S. Packing Co. v. Commissioner, T.C. Memo. 1955-194.  Generally, the taxpayer will bear not only the burden of production, but also the burden of proving by a preponderance of the evidence that the Commissioner's assessment is "arbitrary and excessive".  Helvering v. Taylor, supra at 515; Boles Trucking, Inc. v. United States, 77 F.3d 236 (8th Cir. 1996); Mattingly v. United States, 924 F.2d 785, 787 (8th Cir. 1991).

Under the net worth method, taxable income is computed by reference to the change in the taxpayer's net worth[8] during a year, increased for nondeductible expenses such as living expenses, and decreased for items attributable to nontaxable sources such as gifts and loans.  The resulting figure may be considered to represent taxable income, provided:  (1) The Commissioner establishes the taxpayer's opening net worth with reasonable certainty, and (2) the Commissioner either shows a likely source of unreported income or negates possible nontaxable sources.  United States v. Massei, 355 U.S. 595, 595-596 (1958); Holland v. United States, supra at 132-138; Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985).

---

[8]Assets are generally listed at their cost rather than at their current market value.  Camien v. Commissioner, 420 F.2d 283, 284-285 (8th Cir. 1970), affg. T.C. Memo. 1968-12.

In establishing a taxpayer's net worth the Commissioner owes a duty to the taxpayer of approaching the problem fairly and open mindedly.  Holland v. United States, supra; Banks v. Commissioner, 322 F.2d 530 (8th Cir. 1963), affg. in part and remanding in part T.C. Memo. 1961-237; Gunn v. Commissioner, 247 F.2d 359 (8 Cir. 1957), affg. in part and revg. in part T.C. Memo. 1956-24.  The use of the net worth method requires "the exercise of great care and restraint" to prevent a taxpayer from being "ensnared in a system" that is difficult for the taxpayer to refute.  Holland v. United States, supra at 129.

The taxpayer's opening net worth is of critical importance and must be established with reasonable certainty.  "The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset."  Id. at 132.  Once the Commissioner's determination is established with reasonable certainty, the taxpayer bears the burden of disproving it.  Welch v. Helvering, 290 U.S. 111 (1933); Banks v. Commissioner, supra; Schroeder v. Commissioner, 291 F.2d 649 (8th Cir. 1961), affg. T.C. Memo. 1957-162.

Petitioners assert that respondent's computations of their unreported income under respondent's net worth method are inaccurate because the computations fail to properly account for certain specific items.  Respondent concedes some of the items

that petitioners were able to substantiate with substantial evidence.  At the trial of these cases, petitioners and/or their witnesses testified with regard to these items.  Respondent offered no witness or evidence to contradict their testimony.

The Court may not arbitrarily discredit or disregard uncontradicted evidence that is competent, relevant, and credible.  The Court, however, is not bound to accept improbable, unreasonable, or questionable testimony at face value, even if it is uncontroverted.  Banks v. Commissioner, supra at 537; Weiss v. Commissioner, 221 F.2d 152, 156 (8th Cir. 1955), affg. T.C. Memo. 1954-51; Rand v. Helvering, 77 F.2d 450, 451 (8th Cir. 1935).  The emphasis is on credibility.

In his criminal tax proceeding, Mr. Del Bosque expressly admitted that he omitted substantial income from his 1987, 1988, and 1989 returns with the intent to evade taxes.  For purposes of the sentencing guidelines, Mr. Del Bosque stipulated that he understated his taxable income in 1987, 1988, and 1989 by $116,499 and that the corresponding tax loss was approximately $32,734.  The Government's computation of Mr. Del Bosque's understated income in the criminal tax proceeding was derived from Agent Fisher's computations using the net worth method.

In his criminal tax proceeding, Mr. Jacobsen expressly admitted that he omitted substantial income from his 1987 and 1988 returns with the intent to evade taxes.  For purposes of the

sentencing guidelines, Mr. Jacobsen stipulated that he understated his taxable income in 1987 and 1988 by $58,125 and that the corresponding tax loss was approximately $16,275.

Petitioners' stipulations in their criminal tax proceedings do not collaterally estop them from challenging the specific deficiency amount in this civil proceeding, because "the determination of an exact liability was not essential to the judgment, a prerequisite to the application of the doctrine of collateral estoppel." Moore v. United States, 360 F.2d 353, 356 (4th Cir. 1965) (internal quotation marks omitted); see Wapnick v. Commissioner, T.C. Memo. 1997-133; Larson v. Commissioner, T.C. Memo. 1993-188. Nonetheless, petitioners' stipulations of the amounts of understated income in their criminal tax proceedings are strong evidence that Agent Fisher's net worth computations, and consequently respondent's net worth computations in the notices of deficiency derived directly therefrom, are valid. See Livingston v. Commissioner, T.C. Memo. 2000-121. However, we find petitioners' evidence in these civil cases persuasive that some adjustments to income respondent determined, in addition to those respondent conceded, must be made. We conclude that the net worth computations and nondeductible expenditures used in determining the deficiencies in tax for the years at issue should be adjusted as follows.

### 1. Net Worth Adjustments

#### a. Petitioners' Snowmobiles

On December 31, 1986, petitioners each owned two snowmobiles--each owned a 1987 Polaris Indy 600 and a 1987 Polaris Indy Sport. The 1987 Polaris Indy 600s were purchased from Metro-North Sports on October 15, 1986, for the base price of $4,688 each. Further, two items identified as "north country" were purchased at the same time for $469 each. Although the record does not disclose when the 1987 Polaris Indy Sports were purchased, a receipt from Metro-North Sports shows that, on October 29, 1986, petitioners purchased accessories and parts for two "Indy 600s" and two "Sports". Mr. Jacobsen disposed of his Sport in 1988.

Mr. Del Bosque's 1986 net worth statement includes only his 1987 Polaris Indy 600. The Sport, valued at $2,250, is shown as an asset on his 1987 and 1988 net worth statements. In computing Mr. Del Bosque's taxable income under the net worth method, the Sport should be included as an asset in the 1986 net worth statement.

Mr. Jacobsen's 1986, 1987, and 1988 net worth statements include as an asset a snowmobile valued at $4,688 (the price of the Indy 600). Although the snowmobile included in Mr. Jacobsen's net worth statement is not specifically identified, the parties appear to agree that it is the Indy 600. Mr.

Jacobsen asserts that his 1986 and 1987 net worth statements should include $3,000 representing the value of the Sport. He has offered no evidence to substantiate the cost of the Sport. Mr. Del Bosque's Sport is valued at a cost of $2,500. We conclude that Mr. Jacobsen's 1986 and 1987 net worth statements should also include $2,500 for the Sport. Since Mr. Jacobsen disposed of the Sport in 1988, it was properly omitted from his 1988 net worth statement.

b.   Mr. Del Bosque's First Bank East Account

Mr. Del Bosque asserts that his 1986 net worth should be increased to reflect $12,000 in an account he had at First Bank East. Mr. Del Bosque's financial statement dated September 5, 1986, reflects a savings account at First Bank East with a balance of $12,000 at that time. Although Agent Fisher used the financial statement to identify assets included in the 1986 net worth statement, the First Bank East account was not included as an asset in Mr. Del Bosque's 1986 net worth statement. The existence (but not the amount) of the account is evidenced by Form 1099-INT for 1987 issued by First Bank East to "A J Del Bosque itf Wilma Del Bosque" with Mr. Del Bosque's Social Security number shown as the taxpayer identification number. The Form 1099-INT reports that only $24.93 of interest was paid on the account in 1987, supporting Mr. Del Bosque's testimony that he withdrew most of the money in that account early in 1987. We

believe, and have found, that Mr. Del Bosque used those funds to open a brokerage account in January 1987. We conclude that, in determining the deficiencies in tax, Mr. Del Bosque's 1986 net worth should include $12,000 in the First Bank East account.

c.   Mrs. Jacobsen's Chase Manhattan Money Market With Checks Account

Mrs. Jacobsen had a Chase Manhattan "money market with checks" account (the MMWC account). On December 31, 1986, there was a balance of $8,618 in that account. The account balance was not included as an asset in the Jacobsens' 1986 net worth statement. Respondent concedes that $8,618 should be included on that net worth statement.

d.   The Jacobsens' Joint Chase Manhattan Bank Money Market Account

The Jacobsens had a joint money market account at Chase Manhattan Bank. This account was included as an asset valued at $37,200 on the Jacobsens' 1986 net worth statement. The $37,200 Agent Fisher used as the account balance was based on the amount ($37,200) reflected on financial statements the Jacobsens completed in 1986; Agent Fisher did not confirm the account balance as of December 31, 1986, with Chase Manhattan Bank. Mr. Jacobsen contends that the account balance was at least $38,200 on December 31, 1986. The statement of the account dated February 11, 1987, reports that the account balance was $38,324 as of January 13, 1987. The February statement shows that the

account was interest bearing. The record does not show the amount of interest paid to the account between January 1 and 13, 1986. We conclude, however, that the balance in the account as of December 31, 1986, was approximately $38,000. Therefore, the Jacobsens' 1986 net worth should be increased by $800.

### e. Mrs. Jacobsen's Loan to Her Employer

In December 1986, Mrs. Jacobsen made a $2,000 loan to her employer. This loan was repaid in 1987. The receivable from Mrs. Jacobsen's employer was not included as an asset on December 31, 1986. Respondent concedes that the $2,000 receivable from Mrs. Jacobsen's employer should be included as an asset on the Jacobsens' 1986 net worth statement.

### f. Mrs. Jacobsen's Inheritance

In 1986, Mrs. Jacobsen received an inheritance of $12,518 plus a one-eighth interest in a contract for deed valued at $1,966. The inheritance was not reflected as an asset on the net worth calculations as of December 31, 1986. Mrs. Jacobsen testified that she held the distribution check into 1987 because she could not decide how to spend or invest the funds. She further testified that after she cashed the check in 1987 she kept the cash and used it to pay expenses in 1987 and 1988. Mr. Jacobsen did not produce the canceled check or call the administrator who issued the check on behalf of the estate to confirm when the check was cashed. Furthermore, the inheritance

is not reflected on the financial statements the Jacobsens completed in 1986. We conclude that the Jacobsens' 1986 net worth should not include Mrs. Jacobsen's inheritance.

g. Mr. Del Bosque's Shares of Fidelity Growth Fund

On January 16, 1987, Mr. Del Bosque purchased 234 shares of Fidelity Growth Fund for $3,320. On April 22, 1987, he sold those shares for $3,756 and purchased 1 share for $16. On January 22, 1988, he sold the remaining share for $13. The original 234 shares with a value of $3,320 (rather than the 1 share with a value of $16) were shown as an asset in Mr. Del Bosque's 1987 net worth calculation.

Respondent agrees that Mr. Del Bosque's 1987 net worth should include only 1 share of Fidelity Growth Fund with a value of $16. Therefore, the assets included in the 1987 net worth statement should be reduced by $3,304 ($3,320 - $16).

h. Mr. Del Bosque's Debt to Larson Quinn Motor Co.

At the end of 1987, Mr. Del Bosque owed $3,921 to Larson Quinn Motor Co. The loan was repaid in 1988. The loan was not included as a liability in the 1987 net worth computation but was included as a liability in the 1988 net worth computation. Respondent concedes that the $3,921 debt should be shown as a liability on the 1987 net worth statement and excluded from the 1988 net worth statement.

2.  Nondeductible Personal Expenses

    a.  Petitioners' Leather Goods Purchases

In 1987 and 1988, Mr. Jacobsen purchased $3,770 of leather goods for resale each year.  Mr. Del Bosque purchased $13,298 of leather goods for resale in 1987, $3,862 for resale in 1988, and $2,375 for resale in 1989.  Respondent treated amounts paid by petitioners to North Beach Leathers as nondeductible personal expenses.  These were not personal expenditures but rather expenditures for leather goods purchased and resold.  Although petitioners did not maintain any records of their purchases, a few receipts were obtained from North Beach Leathers.  The receipts show that within a month petitioners purchased numerous jackets in various sizes; the number of jackets purchased supports petitioners' assertions that the jackets were not for personal use but rather for resale.  Petitioners' leather goods sales activities are further confirmed by the testimony of two individuals to whom petitioners sold leather goods during the years at issue.

On the basis of our observation of petitioners' witnesses at trial, including our observation of their demeanor, we found petitioners' witnesses to be credible and earnest.  Their testimony was direct, plausible, and uncontroverted.  It was not evasive, conclusory, or inconsistent.  We are satisfied that their testimony was honest.

We concluded that, in computing petitioners' taxable income each year, the cost of the leather goods purchased each year should be deducted from petitioners' gross receipts as cost of goods sold.

### b.  Mr. Jacobsen's Clothing Purchases

Mr. Jacobsen claims that he often paid for clothing for the limousine drivers.  Specifically, he claims that he paid $349 in 1987 to Jerry Leonard, a big and tall men's store, $349 in 1987 and $771 in 1988 to Daytons department store, and $1,950 in 1988 to Merles department store.  Respondent treated these items as Mr. Jacobsen's personal expenses in computing his income.

Mr. Jacobsen did not call any of the limousine drivers to confirm that he made such purchases.  He offered no sales receipts or other documentary evidence.  We conclude that the items were properly treated as nondeductible personal expenses.

### c.  Mr. Jacobsen's Purchase of a Mobile Telephone System

In 1987, Top Play purchased a mobile telephone system for $1,797.  Payment for the system was charged to Mr. Jacobsen's credit card.  Top Play paid the credit card company $1,300 in 1987 and $763 in 1988 for the purchase of the mobile telephone system.  Agent Fisher treated this purchase as a nondeductible personal expenditure.  Respondent concedes that the item is not a nondeductible personal expense.

B.   Bureau of Labor Statistics Figures

Using the Bureau of Labor Statistics figures, respondent increased Mr. Jacobsen's income by $6,285 in 1987 and $6,309 in 1988.  The figures each year included $266 for cigarettes.  Mr. Jacobsen does not smoke, and respondent concedes that the increase based on the Bureau of Labor Statistics figures should not include the amounts for cigarettes.

The figures also included $1,640 each year for auto repairs. Mr. Jacobsen purchased a new car every year.  Since his cars were always under warranty, Mr. Jacobsen incurred only nominal auto repair expenses.  Although, as respondent points out, some repairs may not be covered by a warranty, we do not believe that it was appropriate to include $1,640 for auto repairs for a new car on the basis of the Bureau of Labor Statistics figures.  We conclude that the increase based on the Bureau of Labor Statistics figures should not include amounts for auto repair expenses.

C.   Computations of Unreported Income

1.   Mr. Del Bosque's Unreported Income

In accordance with the above discussion, Mr. Del Bosque's unreported gross receipts for 1987, 1988, and 1989 are as follows:

|                                | 1986 | 1987 | 1988 | 1989 |
|--------------------------------|------|------|------|------|
| Net worth computation:         |      |      |      |      |
| Assets                         |      |      |      |      |
| Agent Fisher's computations    | $143,230 | $208,392 | $235,941 | $292,189 |
| Snowmobile                     | 2,250 | -- | -- | -- |
| First Bank East                | 12,000 | -- | -- | -- |
| Fidelity Growth Fund           | -- | (3,304) | -- | -- |
| Total assets                   | 157,480 | 205,088 | 235,941 | 292,189 |
| Liabilities                    | 71,995 | 125,564 | 139,430 | 142,708 |
| Larson Quinn Motor Co.         | -- | 3,921 | (3,921) | -- |
| Total liabilities              | 71,995 | 129,485 | 135,509 | 142,708 |
| Net worth                      | 85,485 | 75,603 | 100,432 | 149,481 |
| Less prior year's net worth    |      | 85,485 | 75,603 | 100,432 |
| Increase in net worth          |      | (9,882) | 24,829 | 49,049 |
| Adjustments:                   |      |      |      |      |
| Additions:                     |      |      |      |      |
| Nondeductible expenses         |      |      |      |      |
| Agent Fisher's computations    |      | 75,826 | 86,751 | 77,356 |
| Cost of leather goods          |      | (13,298) | (3,862) | (2,375) |
| Itemized deductions expenditures |    | 12,840 | 22,007 | 23,254 |
| Subtractions:                  |      |      |      |      |
| Nonincome items                |      | (2,546) | (67,090) | (63,912) |
| Adjusted gross income          |      | 62,940 | 62,635 | 83,372 |
| Itemized deductions            |      | (12,118) | (15,627) | (16,545) |
| Personal exemptions            |      | (3,800) | (3,900) | (2,000) |
| Corrected taxable income       |      | 47,022 | 43,108 | 64,827 |
| Taxable income reported        |      | (14,632) | (19,267) | (38,344) |
| Unreported gross receipts      |      | 32,390 | 23,841 | 26,483 |

On April 22, 1987, Mr. Del Bosque purchased 1 share of Fidelity Growth Fund for $16. On January 22, 1988, he sold the share for $13. On his 1988 return, he erroneously reported a basis of $3,320 in the 1 share and a $3,307 long-term capital loss on the sale of the share in that year. Mr. Del Bosque's

1988 long-term capital loss on the sale of that share should be reduced to $3.

### 2. Mr. Jacobsen's Unreported Income

Mr. Jacobsen's unreported gross receipts for 1987 and 1988 are as follows:

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
| Net worth computation: |  |  |  |
| Assets |  |  |  |
| Agent Fisher's computations | $330,569 | $356,098 | $441,985 |
| Snowmobile | 2,500 | 2,500 | -- |
| MMWC account | 8,618 | -- | -- |
| Joint money market account | 800 | -- | -- |
| Loan receivable | 2,000 | - | - |
| Total assets | 344,487 | 358,598 | 441,985 |
| Liabilities | 144,741 | 152,332 | 159,418 |
| Net worth | 199,746 | 206,266 | 282,567 |
| Less prior year's net worth |  | 199,746 | 206,266 |
| Increase (decrease) in net worth |  | 6,520 | 76,301 |
| Additions: |  |  |  |
| Nondeductible expenses |  |  |  |
| Agent Fisher's computations |  | 46,965 | 45,866 |
| Cost of leather goods |  | (3,770) | (3,770) |
| Mobile phone |  | (1,300) | (763) |
| Itemized deductions expenditures |  | 15,295 | 18,967 |
| Subtractions: |  |  |  |
| Nonincome items |  | (2,051) | (59,504) |
| Adjusted gross income |  | 61,659 | 77,097 |
| Itemized deductions |  | (13,130) | (14,857) |
| Personal exemptions |  | (3,800) | (3,900) |
| Corrected taxable income |  | 44,729 | 58,340 |
| Taxable income reported |  | (32,839) | (35,626) |
| Gross receipts |  | 11,890 | 22,714 |
| Bureau of Labor statistics adjustment: |  |  |  |
| Agent Fisher's computations |  | 6,285 | 6,309 |
| Cigarettes |  | (266) | (266) |
| Car repairs |  | (1,640) | (1,640) |
| Correct adjustment |  | 4,379 | 4,403 |
| Total unreported gross receipts |  | 16,269 | 27,117 |

Citing <u>Livingston v. Commissioner</u>, T.C. Memo. 2000-121, petitioners contend that, as a result of the errors in respondent's computations, the computations are so unreliable as to negate any presumption of correctness.  Petitioners assert that the facts in <u>Livingston</u> are "strikingly similar" to the facts in these cases.  We disagree.

In <u>Livingston</u>, we first found the 1989 opening net worth of zero suspect given that the taxpayer was self-employed in that year.  Further, the Commissioner's 1989 net worth computation did not account for the wife's income, which was available to fund the taxpayers' joint expenditures; the computation effectively treated all asset purchases and other joint expenditures as being financed solely by the husband's unreported income.  As a result of those errors, we held that the Commissioner's 1989 net worth computation was so unreliable as to negate any presumption of correctness.

The types of errors in the Commissioner's 1989 net worth computation in <u>Livingston</u> are not present in the case at hand. Respondent's net worth computations of unreported income reflect the combined incomes of petitioners and their wives.  The opening and closing net worths include joint and separate property, and respondent's computations of unreported income take into account the wives' separate income.

Respondent's net worth computations of petitioners' unreported income were not made on the basis of a "strong underlying element of guesswork". Polizzi v. Commissioner, 265 F.2d 498, 502 (6th Cir. 1959), affg. in part and revg. in part T.C. Memo. 1957-159. The errors in respondent's net worth computations of unreported income are more akin to the errors in the Commissioner's net worth computation of the husband's 1990 understatement in Livingston. In Livingston, we reduced the Commissioner's computation of the husband's 1990 understatement by $65,000 attributable to a business owned by the husband's mother and by the $7,523 in settlement proceeds that the taxpayers received as a result of an automobile accident. Those errors, like the errors in this case, did not render the 1990 net worth computation so unreliable as to negate any presumption of correctness.

We have considered all of petitioners' arguments, and to the extent not specifically addressed, we find them unpersuasive.

## II. Issues 4 and 5--Fraud Penalties and/or Additions to Tax

Respondent determined that petitioners are liable for the additions to tax for fraud under section 6653(b) for 1988 and that Mr. Del Bosque is liable for the fraud penalty under section 6663 for 1989.[9]

---

[9]Petitioners concede that their convictions of criminal tax evasion for 1987 under sec. 7201 collaterally estop them from

(continued...)

A taxpayer is liable for an addition to tax or penalty for fraud equal to 75 percent of the part of the underpayment that is due to fraud. Secs. 6653(b), 6663(a). If the Commissioner shows that any part of an underpayment is due to fraud, the entire underpayment is treated as due to fraud unless the taxpayer proves that part of the underpayment is not due to fraud. Secs. 6653(b)(2), 6663(b).

Respondent bears the burden of proving the applicability of the civil fraud additions to tax and penalty by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To sustain this burden, respondent must establish by this level of proof both (1) that there was an underpayment of tax for the taxable year in issue and (2) that at least some portion of the underpayment was due to fraud. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).

---

[9](...continued)
denying that their underpayments of income tax for 1987 were due to fraud for purposes of sec. 6653(b). See Johnson v. Sawyer, 47 F.3d 716, 722 (5th Cir. 1995); Gray v. Commissioner, 708 F.2d 243 (6th Cir. 1983), affg. T.C. Memo. 1981-1; Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985); Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68 (1964); Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965).

A.    Underpayment of Tax

An underpayment will exist where unreported gross receipts are not exceeded by costs of goods sold and deductible expenses. In establishing the requisite underpayment, the Commissioner may not simply rely on the taxpayer's failure to prove error in the deficiency determination.  DiLeo v. Commissioner, supra at 873; Parks v. Commissioner, supra at 660-661; Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).  However, upon clear proof of unreported receipts, the burden of coming forward with offsetting costs or expenses shifts to the taxpayer.  Siravo v. United States, 377 F.2d 469, 473-474 (1st Cir. 1967); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956); United States v. Bender, 218 F.2d 869, 871-872 (7th Cir. 1955); United States v. Stayback, 212 F.2d 313, 317 (3d Cir. 1954).

Here, respondent used the net worth method of proving income, which the Supreme Court has approved as a reasonable and logical means of reconstructing unreported income in a fraud case.  Holland v. United States, 348 U.S. at 125; United States v. Johnson, 319 U.S. 503, 517 (1943).

The Commissioner may prove that the taxpayer underpaid tax by proving that the taxpayer had a likely source of the unreported income, Holland v. United States, supra; Parks v. Commissioner, supra; Nicholas v. Commissioner, 70 T.C. 1057 (1978), or, where the taxpayer alleges a nontaxable source, by

disproving the alleged nontaxable source, <u>United States v.</u>
<u>Massei</u>, 355 U.S. 595 (1958); <u>Kramer v. Commissioner</u>, 389 F.2d
236, 239 (7th Cir. 1968), affg. T.C. Memo. 1966-234; <u>Parks v.</u>
<u>Commissioner</u>, <u>supra</u>.  Petitioners do not allege that they had
nontaxable sources of income during the years at issue.  Their
known sources of income were the limousine service and sales of
leather goods.[10]  Petitioners have not offered any proof of
offsetting costs or expenses except those which we have allowed.
Respondent has shown by clear and convincing evidence that Mr.
Del Bosque underreported his income by $23,841 in 1988 (without
regard to the overstated long-term capital loss from the sale of
the 1 share of Fidelity Growth Fund) and $26,483 in 1989.
Respondent also has shown by clear and convincing evidence that
Mr. Jacobsen underreported his income by $27,649 in 1988.  Thus,
respondent has carried the burden of establishing underpayments
of tax attributable to that omitted income each year by clear and
convincing evidence.

    B.   <u>Fraudulent Intent</u>

    Respondent must prove by clear and convincing evidence that
petitioners had a fraudulent intent.  <u>Parks v. Commissioner</u>,
<u>supra</u> at 664.  This burden is met if it is shown that petitioners

---

[10]Petitioners asserted in their criminal tax proceedings and
at the trial in these cases that the omitted income was from
gambling.  None of the parties has offered any further
description or explanation of petitioners' gambling activities.

intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner, 225 F.2d 216, 220 (6th Cir. 1955), affg. in part and revg. in part on other grounds a Memorandum Opinion of this Court dated Feb. 24, 1954. Fraud is never presumed; it must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Since direct evidence of fraud rarely is available, respondent may prove each petitioner's fraud by circumstantial evidence. Scallen v. Commissioner, 877 F.2d 1364, 1370 (8th Cir. 1989), affg. T.C. Memo. 1987-412; Klassie v. United States, 289 F.2d 96, 101 (8th Cir. 1961).

Courts have identified numerous factors, sometimes referred to as indicia or badges of fraud, which may be persuasive circumstantial evidence of fraud. See, e.g., Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Petzoldt v. Commissioner, supra at 700. We focus on those indicia that appear to be most significant in the context of the record in the instant cases. Although no single factor is necessarily sufficient to establish fraud, a combination of several factors is persuasive circumstantial evidence of fraud. Bradford v. Commissioner, 796

F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601;
Petzoldt v. Commissioner, 92 T.C. at 700.

The following badges of fraud are present in this case: (1)
Substantially understating income over a period of years,(2)
maintaining inadequate records; (3) dealing in cash; (4)
providing incomplete or misleading information to petitioners'
tax preparer, (5) filing false returns, (6) engaging in a pattern
of behavior which indicates an intent to mislead, (7) dishonesty
in a business transaction.  Spies v. United States, 317 U.S. 492,
499 (1943); Conti v. Commissioner, 39 F.3d 658, 662 (6th Cir.
1994), affg. and remanding on other grounds T.C. Memo. 1992-616;
Scallen v. Commissioner, supra; Bradford v. Commissioner, supra
at 307-308; Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th
Cir. 1986), affg. T.C. Memo. 1985-63; Ruark v. Commissioner, 449
F.2d 311, 312-313 (9th Cir. 1971), affg. T.C. Memo. 1969-48;
Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Wright v.
Commissioner, 84 T.C. 636, 643-644 (1985); Farber v.
Commissioner, 43 T.C. 407, 420 (1965), modified 44 T.C. 408
(1965); Middleton v. Commissioner, T.C. Memo. 2002-164.

1.   Failure To Report Substantial Amounts of Income

"Although mere understatement of income alone is not
sufficient to prove fraud, the consistent and substantial
understatement of income is, by itself, strong evidence of
fraud."  Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987);

see also <u>Marcus v. Commissioner</u>, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980).

Mr. Del Bosque failed to report a large portion of his income for 1987, 1988, and 1989, and Mr. Jacobsen failed to report a large portion of his income for 1987 and 1988. Petitioners assert that the income was gambling winnings. Petitioners provided no explanation for underreporting that income regardless of the source. A consistent pattern of underreporting large amounts of income over a period of years is substantial evidence bearing upon an intent to defraud, particularly where the reason for such understatement is not satisfactorily explained or shown to be due to innocent mistake. <u>Holland v. United States</u>, 348 U.S. at 137; <u>Webb v. Commissioner</u>, <u>supra</u> at 379; <u>Lusk v. Commissioner</u>, 250 F.2d 591, 594 (7th Cir. 1957), affg. T.C. Memo. 1955-119; <u>Schwarzkopf v. Commissioner</u>, 246 F.2d 731, 734 (3d Cir. 1957), affg. and remanding T.C. Memo. 1956-155; <u>Kurnick v. Commissioner</u>, 232 F.2d 678, 681 (6th Cir. 1956), affg. T.C. Memo. 1955-31.

2.   <u>Failure To Keep Adequate Books and Records</u>

Taxpayers are required to maintain books and records sufficient to show their tax liabilities. See sec. 6001. Failure to do so is another indicium of fraudulent intent. <u>Bradford v. Commissioner</u>, <u>supra</u> at 307.

Petitioners did not maintain adequate books and records regarding the operation of the limousine service, their sales of leather goods, or their gambling winnings.  Because petitioners' records for the years in issue are insufficient to show the gross receipts from the limousine service, sales of leather goods, or gambling winnings, the records are insufficient to accurately compute petitioners' tax liabilities for the years in issue. Their failure to maintain adequate books and records is indicative of fraud.  See Truesdell v. Commissioner, supra at 1302.

### 3.  Dealing in Cash

Petitioners often failed to keep records of cash income from limousine runs and cash payments made to limousine drivers. Dealings in cash may indicate fraud and heighten the negative effect of inadequate record keeping.  Friedman v. Commissioner, 421 F.2d 658 (7th Cir. 1970), affg. per curiam a Memorandum Opinion of this Court; Nicholas v. Commissioner, 70 T.C. at 1066.

### 4.  Providing Incomplete or Misleading Information to Tax Preparer

Petitioners did not inform their return preparer of their cash items, their income from the sale of leather goods, or their gambling winnings.  These facts also evidence fraud.  See Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37.

5.   Filing False Returns

Filing a false income tax return may be evidence that the taxpayer fraudulently intended to evade taxes.  Bradford v. Commissioner, 796 F.2d at 308; Wright v. Commissioner, supra at 643-644.  In the plea agreements in their criminal tax proceedings, petitioners admitted that they filed false tax returns for 1987, 1988, and/or 1989 and omitted substantial income from those returns with the intent to evade taxes.  They failed to submit credible evidence to contradict those admissions or show that they filed the false returns for any reason other than to evade taxes they knew to be owing.  Petitioners' filing of false tax returns each year is a strong indication of fraudulent intent with respect to those years.  See Klassie v. United States, 289 F.2d at 102.

6.   Pattern of Behavior Which Indicates Intent to Mislead

A taxpayer's course of conduct or a pattern of conduct may establish, by inference, an intent to conceal or mislead.  Spies v. United States, supra at 499; Webb v. Commissioner, 394 F.2d at 379; Otsuki v. Commissioner, 53 T.C. at 105-106.

Mr. Del Bosque admitted in his plea agreement in his criminal tax proceeding that he schemed with Mr. Jacobsen to hide income and evade taxes, filed false tax returns for 1987, 1988, and 1989 in furtherance of that scheme, and omitted substantial

income from those returns with the intent to evade taxes.  Mr. Jacobsen admitted in his plea agreement in his criminal tax proceeding that he schemed with Mr. Del Bosque to hide income and evade taxes, filed false tax returns for 1987 and 1988 in furtherance of that scheme, and omitted substantial income from those returns with the intent to evade taxes.

For purposes of the sentencing guidelines, Mr. Del Bosque stipulated that he "employed the same course of conduct and a common plan with respect to the evasion of taxes in tax years 1987, 1988, and 1989", and Mr. Jacobsen stipulated that he "employed the same course of conduct and a common plan with respect to the evasion of taxes in tax years 1987 and 1988". They reiterated the substance of those admissions in testimony supporting their guilty pleas.

Mr. Del Bosques's admissions are strong evidence that he intended to evade taxes he knew to be owing in 1988 and 1989. Mr. Jacobsen's admissions are strong evidence that he intended to evade taxes he knew to be owing in 1988.

### 7.   Dishonesty in Business Transactions

A taxpayer's dishonesty in business transactions or willingness to defraud others may indicate a willingness to defraud the Commissioner. Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d

1121 (5th Cir. 1975); Johnson v. Commissioner, T.C. Memo. 1999-48; House v. Commissioner, T.C. Memo. 1995-92. Petitioners misrepresented the profitability of the limousine service to Ms. Pavlak. She sued petitioners for fraud and misrepresentation relating to her purchase of Top Play and received a judgment in the amount of $95,000. Petitioners' dishonesty in their business transaction with Ms. Pavlak is evidence of petitioners' willingness to defraud respondent.

C.  Conclusion as to Fraud

We find that the circumstances of this case, taken as a whole, clearly and convincingly establish that petitioners acted with the requisite fraudulent intent, and that their underpayments of tax for 1988 and Mr. Del Bosque's underpayment of tax for 1989 are due to fraud. Accordingly, we sustain respondent's determination that petitioners are liable for the additions to tax for fraud under section 6653(b) for 1988 and that Mr. Del Bosque is liable for the fraud penalty under section 6663 for 1989.

III. Issue 6-Period of Limitations on Assessment and Collection

Section 6501(a) generally imposes a 3-year period of limitations on assessment and collection of tax. There is an exception to this 3-year period in the case of a "false or fraudulent return with the intent to evade tax". Sec. 6501(c)(1); Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir.

1961), affg. T.C. Memo. 1960-32; <u>Colestock v. Commissioner</u>, 102 T.C. 380, 385 (1994).  The determination of fraud for purposes of the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the addition to tax and penalty under sections 6653 and 6663.  <u>Neely v. Commissioner</u>, 116 T.C. 79, 85 (2001); <u>Rhone-Poulenc Surfactants & Specialties v. Commissioner</u>, 114 T.C. 533, 548 (2000).  Thus, because we conclude that petitioners filed fraudulent returns for each of these years, the period for assessment remains open.

To reflect the above,

<u>Decisions will be entered under Rule 155</u>.